No. 22-12217

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

TAMARAH C. LOUIS and EMMANUEL LOUIS,
individually, and on behalf of all others similarly
situated,

Plaintiffs-Appellants,

*v.*

BLUEGREEN VACATIONS UNLIMITED, INC., a
Florida Corporation, and BLUEGREEN
VACATIONS CORPORATION, a Florida
corporation,

Defendants-Appellees.

On Appeal from the United States District Court
for the Southern District of Florida
Hon. Rodolfo A. Ruiz, II
Case No. 21-cv-61938

**Brief of Amici Curiae
Consumer Financial Protection Bureau and
Federal Trade Commission
in Support of Plaintiffs-Appellants and Reversal**

Anisha S. Dasgupta
  *General Counsel*
Joel Marcus
  *Deputy General Counsel*
Bradley Grossman
  *Attorney*
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave. NW
Washington, DC 20580
(202) 326-2994
bgrossman@ftc.gov

Seth Frotman
  *General Counsel*
Steven Y. Bressler
  *Acting Deputy General Counsel*
Ryan Cooper
  *Senior Counsel*
CONSUMER FINANCIAL
  PROTECTION BUREAU
1700 G St. NW
Washington, DC 20552
(202) 702-7541
ryan.cooper@cfpb.gov

*Louis v. Bluegreen Vacations Unlimited, Inc.*, No. 22-12217

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26(b) and Eleventh Circuit Rule 26.1, counsel for *amici curiae* the Consumer Financial Protection Bureau and the Federal Trade Commission certify that the following additional persons and entities have an interest in the outcome of this appeal:

Bateman, Kristin, Acting Assistant General Counsel, CFPB

Bedoya, Alvaro, Commissioner, FTC

Bressler, Steven, Acting Deputy General Counsel, CFPB

Consumer Financial Protection Bureau (CFPB)

Cooper, Ryan, Senior Counsel, CFPB

Dasgupta, Anisha S., General Counsel, FTC

Federal Trade Commission (FTC)

Frotman, Seth, General Counsel, CFPB

Grossman, Bradley D., Attorney, FTC

Hussain, Laura, Former Assistant General Counsel, CFPB

Khan, Lina M., Chair, FTC

Marcus, Joel, Deputy General Counsel, FTC

Slaughter, Rebecca Kelly, Commissioner, FTC

Wilson, Christine S., Commissioner, FTC

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
    CORPORATE DISCLOSURE STATEMENT.............................C-1

TABLE OF CONTENTS ......................................................................i

TABLE OF AUTHORITIES.................................................................ii

STATEMENT OF INTEREST............................................................. 1

STATEMENT ....................................................................................3

    A.    Predatory Lending and Military Readiness ......................3

    B.    The Military Lending Act..................................................7

    C.    Factual Background........................................................ 10

    D.    Procedural History ......................................................... 12

SUMMARY OF ARGUMENT............................................................ 15

ARGUMENT ................................................................................... 16

    I.    The plaintiffs allege that they are party to an illegal
        contract.......................................................................... 16

    II.    The plaintiffs suffered an injury-in-fact when they
        made a payment on the illegal contract........................... 19

    III.    The plaintiffs' injuries are traceable to the illegal
        contract and redressable by an order of the court...........24

    IV.    The district court's holding would undermine the
        remedial purposes of the Military Lending Act................28

CONCLUSION .................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                                                       **Page(s)**

*Bennett v. Spear,*
   520 U.S. 154 (1997) ................................................................................ 25

*CFPB v. FirstCash, Inc.,*
   No. 21-1251 (N.D. Tex. filed Nov. 12, 2021) ............................................ 1

*Cox v. Cmty. Loans of Am., Inc.,*
   625 F. Appx. 453 (11th Cir. 2015) ......................................... 9, 18, 23, 28

*Czyzewski v. Jevic Holding Corp.,*
   580 U.S. 451 (2017) ................................................................................ 20

*Dubuisson v. Stonebridge Life Insurance Co.,*
   887 F.3d 567 (2d Cir. 2018) ............................................................... 22, 23

*Duke Power Co. v. Carolina Environmental Study Group, Inc.,*
   438 U.S. 59 (1978) .................................................................................. 25

*Epic Sys. Corp. v. Lewis,*
   138 S. Ct. 1612 (2018) .............................................................................. 9

*FTC v. Harris Originals of NY, Inc.,*
   No. 22-cv-4260 (E.D.N.Y. filed July 20, 2022) ....................................... 1

*Georgia Republican Party v. Sec. & Exch. Comm'n,*
   888 F.3d 1198 (11th Cir. 2018) ............................................................... 15

*Graham v. Catamaran Health Solutions LLC,*
   940 F.3d 401 (8th Cir. 2017) .............................................................. 22, 23

*Hallums v. Infinity Insurance Co.,*
   945 F.3d 1144 (11th Cir. 2019) ................................................... 21, 23, 24

*Huntco Pawn Holdings, LLC v. U.S. Dep't of Def.,*
   240 F. Supp. 3d 206 (D.D.C. 2016) ...................................................... 28

*Int'l Primate Prot. League v. Administrators of Tulane Educ. Fund,*
   500 U.S. 72 (1991) .................................................................................. 17

*London v. Wal-Mart Stores, Inc.*,
340 F.3d 1246 (11th Cir. 2003).........................................20, 21

*MSPA Claims 1, LLC v. Tenet Fla., Inc.*,
918 F.3d 1312 (11th Cir. 2019) ............................................ 20

*Pincus v. Am. Traffic Sols., Inc.*,
986 F.3d 1305 (11th Cir. 2021) ............................................27

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ............................................ 16, 19, 23, 24

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ..............................................................15

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
444 U.S. 11 (1979) ...........................................................18, 23

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021)......................................................20, 23

*Trichell v. Midland Credit Mgmt., Inc.*,
964 F.3d 990 (11th Cir. 2020) ............................................ 20

*Wendt v. 24 Hour Fitness USA, Inc.*,
821 F.3d 547 (5th Cir. 2016)..............................................22, 23

*Wilding v. DNC Servs. Corp.*,
941 F.3d 1116 (11th Cir. 2019)........................................25, 27

**Statutes**

10 U.S.C. § 987 .........................................................................1

10 U.S.C. § 987(a) ...............................................................7, 8

10 U.S.C. § 987(b).................................................................1, 8

10 U.S.C. § 987(c) ........................................................ 1, 8, 29

10 U.S.C. § 987(c)(1)(A) .................................................... 8, 17

10 U.S.C. § 987(e).................................................................8, 9

10 U.S.C. § 987(e)(3) ...................................................... 1, 8, 18

10 U.S.C. § 987(f)(1) ............................................................ 9, 28

10 U.S.C. § 987(f)(3) ............................................................ *passim*

10 U.S.C. § 987(f)(4) ..............................................................1, 9

10 U.S.C. § 987(f)(5) ........................................... 2, 10, 19, 29

10 U.S.C. § 987(f)(5)(A)(i) .......................................... 10, 27

10 U.S.C. § 987(f)(5)(A)(ii) ...............................................10

10 U.S.C. § 987(f)(5)(A)(iii)-(iv) ................................. 10, 27

10 U.S.C. § 987(f)(6) ...............................................................1

10 U.S.C. § 987(h)(3)(A), (E) ........................................... 2

10 U.S.C. § 987(i)(2) ...............................................................7

10 U.S.C. § 987(i)(6) ............................................................. 8

10 U.S.C. § 987(i)(6)(A) .......................................................13

10 U.S.C. § 1072(2)(A), (D), (E) .......................................7

15 U.S.C. § 1607(a)(6), (c) ...................................................1

John Warner National Defense Authorization Act for Fiscal Year 2007,
    Pub. L. No. 109-364, § 670(a), 120 Stat. 2083, 2266–69 (2006) .............7

National Defense Authorization Act for Fiscal Year 2013,
    Pub. L. No. 112-239, § 6662, 126 Stat. 1632 (2013) ................................. 9

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ....................................13

Federal Rule of Civil Procedure 12(b)(6) ....................................13

**Regulations**

32 C.F.R. § 232.3(f) ...................................................... 8

32 C.F.R. § 232.3(f)(2)(i)–(ii) ................................................. 8

32 C.F.R. § 232.3(p) ................................................................ 8

32 C.F.R. § 232.4(b) ................................................................ 1

32 C.F.R. § 232.6 ................................................................ 1, 8

32 C.F.R. § 232.6(a)(1), (c) ..................................................... 8

32 C.F.R. § 232.8(c) ............................................................ 1, 9

32 C.F.R. § 232.9(c) .............................................................. 17

32 C.F.R. § 232.9(d) ............................................................ 1, 9

## Other Authorities

*A Review of the Department of Defense's Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents: Hearing Before the S. Comm. on Banking, Hous., & Urban Aff.*,
109th Cong. 1 (2006) ....................................................... 6, 28

Anthony Camilli & Joshua Friedman, *WARNO: New Security Clearance Guidelines Make It More Important than Ever for Servicemembers to Monitor their Credit*, (Aug. 20, 2018) ............................... 5, 6

*Protecting Military Servicemembers and Veterans from Financial Scams and Fraud: Hearing before the H. Comm. Oversight & Reform*,
117th Cong. (July 13, 2022) ................................................ 3, 4

Ron Leiber, *Where Military Paychecks Are Prime Targets*,
N.Y. Times (July 1, 2022) ....................................................... 3

The Structure of Standing,
98 Yale L.J. 221 (1988) ......................................................... 17

U.S. Dep't of Def., Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents (2006) ......... 4, 5, 6

**STATEMENT OF INTEREST**

The Military Lending Act (MLA), 10 U.S.C. § 987, protects military families from predatory lending. The MLA provides active-duty servicemembers and their dependents certain protections in consumer financial markets. For example, the law prohibits creditors from requiring servicemembers to pay an annual interest rate greater than thirty-six percent on any covered loan. 10 U.S.C. § 987(b); 32 C.F.R. § 232.4(b). The law also requires that creditors provide servicemembers certain information before issuing a loan. 10 U.S.C. § 987(c); 32 C.F.R. § 232.6. And the law protects servicemembers in other ways as well, including by prohibiting creditors from requiring them to submit to arbitration. 10 U.S.C. § 987(e)(3), (f)(4); 32 C.F.R. §§ 232.8(c), 232.9(d).

The Consumer Financial Protection Bureau (Bureau) and the Federal Trade Commission (FTC), along with other agencies, are charged with enforcing the MLA. *See* 10 U.S.C. § 987(f)(6); 15 U.S.C. § 1607(a)(6), (c). The Bureau and the FTC exercise this enforcement authority to protect American servicemembers and their families. *E.g.*, *CFPB v. FirstCash, Inc.*, No. 21-1251 (N.D. Tex. Nov. 12, 2021); *FTC v. Harris Originals of NY, Inc.*, No. 22-cv-4260 (E.D.N.Y. July 20, 2022). The Bureau and the FTC also

consult with the Department of Defense (DoD) on the issuance of regulations implementing the MLA. *See* 10 U.S.C. § 987(h)(3)(A), (E).

In this case, the plaintiffs, a servicemember and his spouse, allege that the defendants issued them a loan that violated the MLA because it contained a mandatory arbitration clause and failed to provide required disclosures. A loan that violates the MLA is "void from [its] inception." *Id.* § 987(f)(3). When a lender violates the MLA, the borrower may sue for damages and "appropriate equitable or declaratory relief." *Id.* § 987(f)(5). Nevertheless, the district court held that the plaintiffs in this case could not bring suit to enforce the law and obtain the remedies afforded to them by Congress. The court reasoned that the plaintiffs have not suffered a sufficiently concrete injury to show Article III standing.

That holding is erroneous: The plaintiffs allege that they made a payment on an unlawful loan. They now bring suit to contest the legality of that loan, seek judicial clarification of whether they are bound by the loan's terms, and get their money back. The plaintiffs have an acute personal stake in the outcome of this litigation. They thus have standing.

The district court's holding, if affirmed, would substantially curtail enforcement of the MLA. It would, in effect, bar servicemembers from bringing suit unless they can show that the alleged violation of the MLA

was material to their decision to take out the loan at issue. Imposing such a requirement would contravene precedent holding that plaintiffs have Article III standing to challenge a contract that is void *ab initio*. And it would circumvent Congress's judgment that allowing American servicemembers to enforce their rights in court is essential to our national security. For these reasons, the Bureau and the FTC have a substantial interest in the outcome of this case.

## STATEMENT

### A. Predatory Lending and Military Readiness

Predatory lenders target members of the Armed Services. *See generally Protecting Military Servicemembers and Veterans from Financial Scams and Fraud: Hearing before the H. Comm. Oversight & Reform*, 117th Cong. (July 13, 2022) (testimony of James S. Rice, Assistant Director, CFPB) ("Rice Testimony");[1] *see also* Ron Leiber*, Where Military Paychecks Are Prime Targets*, N.Y. Times (July 1, 2022).[2]

---

[1] *Available at* https://www.consumerfinance.gov/about-us/newsroom/written-testimony-of-james-s-rice-assistant-director-office-of-servicemember-affairs-before-the-house-committee-on-oversight-and-reform-subcommittee-on-national-security.

[2] *Available at* https://www.nytimes.com/2022/06/30/your-money/fort-campbell-military-installations.html.

"It's an unfortunate fact that our men and women in uniform are prime targets for scams and bad actors in the financial marketplace." Rice Testimony at 2. This unfortunate fact is evident from the hundreds of thousands of complaints the Bureau has received from servicemembers and their families. *Id.* These complaints come "from every branch of the military and every rank." *Id.* They "come from throughout the United States, the District of Columbia, the territories, and from military installations across the globe." *Id.*

The financial exploitation of American military families is a longstanding problem. In 2006, DoD submitted a report to Congress finding that "predatory loan practices and unsafe credit products are prevalent and targeted at military personnel." U.S. Dep't of Def., Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents 45 (2006) ("DoD Report").[3] DoD urged Congress to act, given that "predatory lending undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all volunteer fighting force." *Id.* at 9.

---

[3] *Available at* https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.

According to the DoD Report, "[m]ilitary families have characteristics that can make them a market of choice for predatory lenders." *Id.* at 10. Military families are easy to target because they "are physically concentrated in and around bases." *Id.* Moreover, many active-duty servicemembers are young and do not have "a lot of experience in managing finances" or "a cushion of savings to help them through emergencies." *Id.* These young servicemembers are frequently receiving "their first significant paycheck," and they "are on their own without the guidance or assistance of family." *Id.* While they may not have the experience or support necessary to manage their finances, they do have a reliable income. They "are paid regularly and are not likely to be downsized, outsourced or to quit their employment." *Id.*

Servicemembers also have a strong incentive to pay. Not only does "military culture emphasize financial responsibility," military policy requires servicemembers to pay their debts. *Id.* If they do not, they face serious repercussions. *Id.* A servicemember in financial distress may "lose his security clearance" or "be temporarily removed from his assignment." *Id.* at 86–87 (App. 5) (statement of Capt. Mark D. Patton); *see also* Anthony Camilli & Joshua Friedman, CFPB, *WARNO: New Security*

*Clearance Guidelines Make It More Important than Ever for Servicemembers to Monitor their Credit* (Aug. 20, 2018).[4]

Indeed, the 2006 DoD Report found that some creditors do not even run credit checks on servicemembers. DoD Report at 64 (App. 3) (Survey on Internet Payday Loan and Installment Lenders). There is no need because, under the Uniform Code of Military Justice, "military personnel that do not meet their financial commitments may be subjected to confinement, clearance [revocation], court martial, transfer, or even discharge." *Id.*

Congress agreed with DoD that predatory lending posed "a real threat to our national defense." *A Review of the Department of Defense's Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents: Hearing Before the S. Comm. on Banking, Hous., & Urban Aff.*, 109th Cong. 1 (2006) ("2006 Senate Hearing") (statement of Sen. Elizabeth Dole);[5] *see also id.* (statement of Chairman Shelby) ("As long as certain unscrupulous lenders continue to employ predatory practices,

---

[4] *Available at* https://www.consumerfinance.gov/about-us/blog/warno-new-security-clearance-guidelines-make-it-more-important-ever-servicemembers-monitor-their-credit.

[5] *Available at* https://www.govinfo.gov/content/pkg/CHRG-109shrg50303/html/CHRG-109shrg50303.htm.

our servicemen and women suffer and the toll on our readiness will increase.").

Accordingly, in 2006, Congress passed the MLA on a bipartisan basis and, in doing so, enacted a variety of statutory safeguards that the Department of Defense requested to protect military families from predatory lending. *See* John Warner National Defense Authorization Act for Fiscal Year 2007, Pub. L. No. 109-364, § 670(a), 120 Stat. 2083, 2266–69 (2006).

## B. The Military Lending Act

The MLA, as enacted, aims to protect military families from predatory lending by establishing rules governing the types of loans that creditors can issue to active-duty servicemembers and their dependents. The MLA applies to any extension of "consumer credit" to a "covered member of the armed forces or a dependent of such a member." *E.g.*, 10 U.S.C. § 987(a). The term "dependent" generally refers to a servicemember's spouse, child, or parent. *See id.* § 987(i)(2); *id.* § 1072(2)(A), (D), (E).[6] The term "consumer credit" means "credit offered or extended to a covered borrower primarily for personal, family, or household purposes," and that is

---

[6] The term "servicemember" is used, hereinafter, to include covered dependents.

"[s]ubject to a finance charge" or "[p]ayable by a written agreement in more than four installments." 32 C.F.R. § 232.3(f). Certain residential mortgages and automotive loans are not considered "consumer credit" and are thus not subject to the MLA. 10 U.S.C. § 987(i)(6); *see also* 32 C.F.R. § 232.3(f)(2)(i)–(ii).

The MLA imposes a variety of requirements that creditors must follow when issuing loans to servicemembers. The law imposes a ceiling on the interest rate that can be charged to servicemembers, 10 U.S.C. § 987(b), limits when a creditor can require a servicemember to make interest payments, *id.* § 987(a), mandates that creditors provide servicemembers certain disclosures, *id.* § 987(c), and imposes other limitations on the terms of loans that can be offered to servicemembers, *id.* § 987(e). Two of the MLA's requirements are relevant here.

First, before issuing a loan to a servicemember, a creditor must provide the servicemember "[a] statement of the annual percentage rate of interest," *id.* § 987(c)(1)(A), known as the "military annual percentage rate (MAPR)," 32 C.F.R. § 232.3(p); *see also id.* § 232.6(a)(1), (c).

Second, under the MLA, a creditor may not require arbitration as a condition of offering a servicemember a loan. The MLA includes two provisions that prohibit mandatory arbitration. Section 987(e)(3) states

that "[i]t shall be unlawful for any creditor to extend consumer credit" to a servicemember if, in doing so, "the creditor requires the borrower to submit to arbitration." 10 U.S.C. § 987(e); *see also* 32 C.F.R. § 232.8(c); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626 (2018) (noting that, under the MLA, "requiring a party to arbitrate is 'unlawful.'"). Separately, section 987(f)(4) states that "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable." 10 U.S.C. § 987(f)(4); *see also* 32 C.F.R. § 232.9(d).

The MLA includes a variety of enforcement mechanisms. To begin, if a creditor "knowingly" violates the MLA, it can be charged criminally, fined, and imprisoned. 10 U.S.C. § 987(f)(1). Next, the law provides that "[a]ny credit agreement, promissory note, or other contract prohibited under [the MLA] is void from the inception of such contract." *Id.* § 987(f)(3). Finally, in 2013, Congress amended the MLA to provide an explicit private right of action. *See* National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, § 6662, 126 Stat. 1632 (2013).[7] The law, as amended, states that any "person who violates [the MLA] with respect to any person is

---

[7] This Court held that the pre-2013 version of the MLA included an implied private right of action. *See Cox v. Cmty. Loans of Am., Inc.*, 625 F. Appx. 453, 458 (11th Cir. 2015).

civilly liable to such person." 10 U.S.C. § 987(f)(5). It allows a court to assess "any actual damages sustained" as a result of the violation, but "not less than $500 for each violation," as well as "appropriate punitive damages." *Id.* § 987(f)(5)(A)(i)–(ii). A court may also enter "appropriate equitable or declaratory relief" and "any other relief provided by law." *Id.* § 987(f)(5)(A)(iii)–(iv).

## C.   Factual Background

Emmanuel and Tamarah Louis, the plaintiffs in this case, financed the purchase of a timeshare interest in a vacation property from the defendants, Bluegreen Vacations Unlimited, Inc. and Bluegreen Vacations Corporation (collectively, "Bluegreen"). At the time of the transaction, Emmanuel was an active-duty member of the United States Army and Tamarah was his spouse. Doc. 16 at 2.

Bluegreen operates the "Bluegreen Vacations Club." *Id.* Membership in the club requires purchasing a timeshare interest in a condominium unit at a Bluegreen property. *Id.* Members must hold the deed to their timeshare in the Bluegreen Vacation Club Trust. *Id.* In return, the members are allotted "Vacation Points," which can be used like currency to book reservations at various Bluegreen-owned resorts around the country. *Id.*

In December 2020, Emmanuel and Tamarah joined the Bluegreen Vacation Club. *Id.* To do so, the couple entered into a contract with Bluegreen, entitled, "Bluegreen Owner Beneficiary Agreement." *Id.* at 27–36. Under the agreement, Emmanuel and Tamarah purchased an interest in a unit at the Resort at World Golf Village, a vacation property in St. Augustine, Florida. *Id.* at 27. They were required to hold the deed to their timeshare interest in a trust, and, in return, they were entitled to an allotment of vacation points to use at Bluegreen properties. *Id.* at 27.

Emmanuel and Tamarah purchased the timeshare for $11,500. *Id.* at 28. They paid a ten percent down payment of $1,150 plus a separate $450 administrative fee. *Id.* The agreement required the couple to pay back the remaining balance of $10,350 to Bluegreen in monthly installments over ten years at an interest rate of 16.99%. *Id.* This required them to make monthly payments of $179.81, *id.*, in addition to annual assessments and club dues, which they were also required to pay, *id.* at 30–31. There is no statement of the military annual percentage rate in any of the loan documents Bluegreen provided the couple. *Id.* at 9–10. Bluegreen did not make any supplemental oral disclosures. *Id.* at 10.

The timeshare agreement purported to require Emmanuel and Tamarah to waive certain legal rights. Most pertinently, the timeshare

agreement includes a provision stating that any legal claim the couple may have related to the purchase must be resolved through binding arbitration. *Id.* at 10, 21–22, 34. The agreement also purported to waive the couple's right to pursue a class action and their right to a jury trial. *Id.* at 34.

## D. Procedural History

On September 14, 2021, Emmanuel and Tamarah, on behalf of themselves and a putative class, sued Bluegreen in the Southern District of Florida asserting two claims under the MLA. First, the couple alleges that Bluegreen failed to include the required MAPR statement in the timeshare agreement. *Id.* at 15–20 (Counts I & II). They contend that the $450 administrative fee should have been included in the calculation of the MAPR, and, because it was not, Bluegreen understated the timeshare agreement's true cost of credit. Second, the couple alleges that Bluegreen violated the MLA by including a mandatory arbitration clause in the timeshare agreement. *Id.* at 21–23 (Count III).

Emmanuel and Tamarah seek an order declaring the timeshare agreement void, rescission of the agreement, and restitution, as well as statutory, actual and punitive damages. *Id.* at 23. The couple also seek an injunction requiring Bluegreen to comply with the MLA going forward,

including by making a "reasonable effort" to determine whether future borrowers are covered by the law. *Id.* at 24.

Bluegreen moved to dismiss for lack of Article III standing under Federal Rule of Civil Procedure 12(b)(1) and, in the alternative, for failure to state a claim under Rule 12(b)(6). In its motion, Bluegreen argued that the plaintiffs lacked standing because they had not suffered any concrete injury and, even if they had, whatever injury they suffered was not traceable to the alleged MLA violations. Bluegreen also argued that the timeshare loan was exempt under the MLA exemption for residential mortgages, *see* 10 U.S.C. § 987(i)(6)(A).[8] Finally, Bluegreen argued that the MLA does not authorize statutory damages and that plaintiffs failed to state a claim for declaratory or injunctive relief.

The magistrate judge recommended the case be dismissed for lack of standing. Doc. 45. The judge reasoned that the plaintiffs "failed to allege any facts to plausibly establish any causal connection whatsoever between [their] payment under the contract—their alleged concrete injury—and the … MLA violations." Doc. 45 at 8–9. Because the plaintiffs did not "allege

---

[8] The district court did not reach the issue of whether the timeshare agreement is an exempt residential mortgage under 10 U.S.C. § 987(i)(6)(A). Accordingly, we do not address that issue here.

that proper calculation and presentation of the MAPR … would have had any bearing on their decision to accept the contract," the magistrate judge concluded that the plaintiffs' MAPR claim was nothing more than a "bare procedural violation," insufficient to confer standing. *Id.* at 9. Similarly, the magistrate judge found that plaintiffs had failed to allege "that the inclusion of the arbitration provision impacted [their] decision to accept the contract," and that they could not "seek[] relief based on a mere technicality that has not impacted them in any way." *Id.* at 12.

The district court adopted the magistrate judge's recommendation and dismissed the case for lack of standing. Doc. 52. The district court's reasoning, however, differed slightly from the magistrate judge's analysis: It held that the plaintiffs lacked standing because their injuries were not sufficiently concrete. *Id.* at 3 n.1. Otherwise, the district court largely agreed with the magistrate judge. In the view of the court, the two alleged MLA violations did not "impact[] Plaintiffs in any way." *Id.* at 3. Absent any allegation that the alleged MLA violations resulted in "downstream consequences," the district court concluded that plaintiffs had not alleged a cognizable injury. *Id.* Accordingly, on May 31, 2022, the court dismissed the case for lack of Article III standing. *Id.* at 4.

On June 30, 2022, the plaintiffs filed this appeal. Doc. 53.

## SUMMARY OF ARGUMENT

Emmanuel and Tamarah Louis allege that they were sold an illegal financial product—a product that Congress determined poses such an acute risk to American servicemembers, to their financial wellbeing, to their morale, to the military's operational readiness, and to the country's national defense that it should be illegal to sell the product to members of the Armed Services. The couple alleges that because Bluegreen sold them an illegal financial product, they are now party to a contract that is, by operation of federal statute, void from its inception. And they allege that they have already made a substantial down payment pursuant to that void contract. They now ask a federal court to rescind the contract, to order restitution for any amounts paid pursuant to its terms, and to enter any other appropriate relief.

The couple has clearly alleged a sufficient "personal stake in the outcome of [this] controversy as to warrant ... invocation of federal-court jurisdiction." *Georgia Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1201 (11th Cir. 2018) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009)). Nonetheless, the district court held that the plaintiffs lack Article III standing because they were not concretely injured by the two MLA violations they allege (failure to provide mandatory

disclosures and inclusion of a prohibited arbitration agreement). This holding is erroneous.

The plaintiffs have satisfied the three-prong test for standing. First, they have established a concrete injury by alleging that they have already rendered payment pursuant to an illegal and void loan. Monetary loss is the epitome of a concrete injury. Second, the plaintiffs have satisfied their modest burden of showing that these injuries are traceable to the challenged conduct, because their monetary losses are the product of the illegal and void loan. Finally, the plaintiffs' injuries are redressable by an order of the court awarding restitution for the amounts that plaintiffs have already paid on the loan, and by a declaration confirming that the loan is void and that the plaintiffs have no obligation to make additional payments going forward.

## ARGUMENT

### I. The plaintiffs allege that they are party to an illegal contract.

The plaintiffs have Article III standing (and this court has jurisdiction) if they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). This inquiry turns, in part, on precisely what conduct the

plaintiffs allege to be illegal. Accordingly, the first step to determining whether a plaintiff has standing is to define the scope of the "challenged conduct," *id.*, in reference to the "specific common-law, statutory or constitutional claims that a party presents," *Int'l Primate Prot. League v. Administrators of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991).

Whether a plaintiff has standing is "a question of substantive law" that cannot be answered without "reference to the statutory and constitutional provision whose protection is invoked." *Id.* (quoting Fletcher, The Structure of Standing, 98 Yale L.J. 221, 229 (1988)). Here, the plaintiffs invoke the protections Congress afforded to servicemembers under the MLA. Thus, the standing inquiry must begin with a proper understanding of what the MLA renders illegal.

The MLA makes it illegal to extend any non-compliant credit product to a servicemember. The law states that "[a]ny credit agreement, promissory note, or other contract prohibited under [the MLA] is void from the inception of such contract." 10 U.S.C. § 987(f)(3); *see also* 32 C.F.R. § 232.9(c). The plaintiffs allege that the timeshare agreement fails to comply with the MLA in two ways. First, Bluegreen failed to provide the plaintiffs a MAPR disclosure as required by section 987(c)(1)(A). Second, the timeshare agreement failed to comply with the prohibition on

mandatory arbitration in section 987(e)(3). If true, these allegations mean the timeshare agreement is prohibited by the MLA and rendered void by section 987(f)(3).

By declaring contracts that violate the MLA void and providing a private right of action, Congress determined that those contracts are illegal and that servicemembers should have the right to challenge the legality of those contracts in court. When "Congress declare[s] ... that certain contracts are void, it intend[s] that the customary legal incidents of voidness ... follow, including the availability of a suit for rescission or for ... restitution." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979). Thus, when Congress, in section 987(f)(3), said that any contract prohibited by the MLA is "void from [its] inception," it intended not only that a contract prohibited by the MLA would be unenforceable but also that the legality of the contract could be litigated in court and appropriate remedies awarded.

Even before Congress amended the MLA to provide an express private right of action, this Court held: "The MLA unambiguously confers on covered members of the armed forces and their dependents certain legal rights, including the right to rescind and seek restitution on a contract void under the criteria of the statute." *Cox v. Cmty. Loans of Am. Inc.*, 625 F.

App'x 453, 457–58 (11th Cir. 2015) (cleaned up). And Congress confirmed its intent to confer servicemembers with these rights when, in 2013, it amended the statute to add a private right of action allowing servicemembers to bring suit under the statute and to expressly authorize a wide array of civil remedies. *See* 10 U.S.C. § 987(f)(5) (making "[a] person who violates this section … civilly liable to such person" for damages, appropriate equitable or declaratory relief, or any other relief provided by law).

The Article III analysis must be understood in this context. The "challenged conduct," *Spokeo*, 578 U.S. at 338, at issue is Bluegreen's decision to issue an illegal credit product to a servicemember and his covered spouse in violation of the MLA. The remaining questions for the Court are whether any concrete injuries suffered by the plaintiffs are traceable to that illegal credit product—rendered void from its inception by statute—and, if so, whether those injuries are redressable by an order of the court. They clearly are.

## II. The plaintiffs suffered an injury-in-fact when they made a payment on the illegal contract.

The district court held that Emmanuel and Tamarah lack Article III standing to challenge the legality of the timeshare agreement in court because they "fail to identify any concrete harm they have experienced as a

result of the statutory violations." Doc. 52 at 2–3. Contrary to that holding, the couple has suffered economic injuries as a result of Bluegreen's unlawful conduct that are sufficient to confer standing.

It is "obvious" that a "monetary injury" constitutes "a concrete injury in fact under Article III." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). An "economic injury" is, as this Court has noted, the "epitome" of a concrete injury. *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019). Indeed, "[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017); *see also Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 997 (11th Cir. 2020) (citing the rendering of "payments" on a debt as a type of "tangible injury" that would "qualify as concrete").

 Given that monetary loss *obviously* constitutes Article III injury, if a plaintiff has rendered payment pursuant to an (allegedly) illegal contract, then the plaintiff may bring suit to challenge the legality of that contract and obtain a refund. Multiple federal courts of appeals, including this one, have recognized this principle.

In *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1249 (11th Cir. 2003), the plaintiff argued that "paying consideration pursuant to an illegal

contract" is a sufficient injury to confer standing, and this Court agreed. The plaintiff argued that he was sold a credit life insurance policy that was "void and unenforceable" under state law, and as a result, he was "an innocent party to an illegal contract." *Id.* This Court rejected the defendants' argument that the plaintiffs had not suffered an injury-in-fact and found that because the plaintiff had paid consideration for the allegedly illegal policy, he had standing to sue. *Id.* at 1251–52.

While standing doctrine has evolved since *London* was decided, it remains the case that payment of consideration on an illegal contract is a sufficient injury to confer standing. This Court reaffirmed that principle in *Hallums v. Infinity Insurance Co.*, 945 F.3d 1144 (11th Cir. 2019). There, the plaintiffs alleged that a provision in their car insurance policies was illusory under federal law. This Court held that the plaintiffs had "met the burden of standing by alleging [a] harm in the form of premium payments on illegal policies." *Id.* at 1147–48 (citing *London*, 340 F.3d at 1252) (cleaned up). It did not matter that the plaintiffs had not filed claims on the policy (or otherwise been injured by the illusory insurance provision) "because the alleged injury occurred at the time they paid for the [policy]." *Id.* at 1148.

Other courts agree. For instance, in *Dubuisson v. Stonebridge Life Insurance Co.*, 887 F.3d 567 (2d Cir. 2018), the plaintiffs had "paid premiums for disability and medical expense insurance policies," which they claimed were "illegal under New York law and therefore void *ab initio*." *Id.* at 574. Even though the plaintiffs "did not suffer qualifying losses or make claims for coverage under their policies," the Second Circuit nonetheless held they had standing to challenge the legality of those policies and seek reimbursement of the premiums they had already paid. *Id.* at 571. The court so held because the plaintiffs "articulated a concrete, economic injury: payment of premiums on a void or voidable insurance policy." *Id.* at 574.

The Eighth Circuit has reached the same conclusion. In *Graham v. Catamaran Health Solutions LLC*, 940 F.3d 401 (8th Cir. 2017), it considered facts similar to those in *Dubuisson*. It held that if a contract "is deemed void *ab initio* due to non-compliance with state law," then a party who has rendered payment pursuant to that contract "will have suffered a compensable economic injury" sufficient to confer standing. *Id.* at 408.[9]

---

[9] The magistrate judge's reliance on *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547 (5th Cir. 2016) to reach a contrary conclusion is unpersuasive. *See* Doc. 45 at 12. There, the Fifth Circuit held that consumers did not have standing to challenge gym membership contracts that they alleged were

The district court ignores these precedents. Instead, it relies principally on *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) and *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2206 (2021). Those cases held that "Article III standing requires a concrete injury even in the context of a statutory violation," *Ramirez*, 141 S. Ct. at 2205 (quoting *Spokeo*, 578 U.S. at 341), and that some, but not all, "intangible harms" constitute concrete injuries, *see id.* (citing *Spokeo*, 578 U.S. at 340–41). Those holdings have no relevance here because the plaintiffs allege the quintessential *tangible* injury: monetary loss. The Court in both *Spokeo* and *Ramirez* made clear that "monetary harms" are "tangible harms" that "readily qualify as concrete injuries under Article III." *Id.* (citing *Spokeo*, 578 U.S. at 340–41).

---

void under Texas state law. For one, that decision is out of step with the wealth of other cases that have held that payment on a void contract is a sufficient injury to confer standing. *E.g.*, *Hallums v. Infinity Ins. Co.*, 945 F.3d 1144, 1147 (11th Cir. 2019); *Dubuisson v. Stonebridge Life Ins. Co.*, 887 F.3d 567, 574 (2d Cir. 2018); *Graham v. Catamaran Health Sols. LLC*, 940 F.3d 401, 408 (8th Cir. 2017). Moreover, that decision turned on a feature of Texas law not relevant here. Texas law "permits a plaintiff to recover … under a void contract *only if* the defendant fails to give the plaintiff all or part of what he paid for, or if the statute that renders the contract void explicitly provides that the plaintiff is not liable to pay for any past services rendered." *Wendt*, 821 F.3d at 551 (emphasis added). Federal law imposes no similar limitations on a plaintiff's right to bring suit to challenge a void contract. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979); *Cox*, 625 F. App'x at 457–58.

The plaintiffs allege that they have rendered payment on an illegal contract. That economic injury is tangible, it is concrete, and, under this Court's precedent, it "is enough for standing." *Hallums*, 945 F.3d at 1148.

## III. The plaintiffs' injuries are traceable to the illegal contract and redressable by an order of the court.

The final two prongs of the test for Article III standing require plaintiffs to show that their alleged injuries are "fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338. Each of these prongs is satisfied here.

The plaintiffs' injuries (having rendered payment on an illegal and void loan) are fairly traceable to the challenged conduct (the issuance of an illegal and void loan). This is true notwithstanding the magistrate judge's contrary reasoning. While acknowledging that the plaintiffs "suffered a concrete injury by paying money to" Bluegreen, the magistrate judge found that plaintiffs nonetheless lacked standing because the "economic harm" they suffered was not "fairly traceable" to Bluegreen's "procedural violations of the MLA." Doc. 45 at 12. This misses the mark for two reasons.

First, as the magistrate judge acknowledged, "establishing causation for standing purposes does not require a party to establish proximate cause." *Id.* Plaintiffs are required to show only that their injuries "flow

indirectly from the action in question." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1126 (11th Cir. 2019). This is a "relatively modest" burden. *Bennett v. Spear*, 520 U.S. 154, 168–71 (1997). The fact that the contract violated particular provisions of the MLA rendered the contract void, and making payment on the void contract injured the plaintiffs. Their "modest burden" is therefore satisfied here because the plaintiffs' economic injuries were the result of an illegal and void loan.

Second, the plaintiffs allege that Bluegreen acted unlawfully when it extended credit to them in violation of the MLA and, as a result, the timeshare agreement is illegal and void in its entirety. Therefore, the plaintiffs' burden is to show that their injuries are fairly traceable to the timeshare agreement itself, because it is the agreement in its entirety that the plaintiffs contend is illegal. They are not required to show that their injuries are directly traceable to the particular provisions in the timeshare agreement that are prohibited by the MLA.

This concept is illustrated by the Supreme Court's holding in *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59 (1978). There, the Court considered whether a group of plaintiffs had standing to challenge the constitutionality of the Price-Anderson Act, a law that limited nuclear power providers' civil liability for nuclear accidents.

The plaintiffs alleged that the law violated the Fifth Amendment because, by capping liability, it prevented the victims of a nuclear accident from being compensated for their injuries. *Id.* at 67–68.

However, the plaintiffs were not seeking compensation for a nuclear accident. Rather, they alleged a variety of injuries that resulted from living near an illegally subsidized nuclear power plant. The defendants argued that the plaintiffs did not have standing because "the environmental and health injuries" the plaintiffs suffered were "not directly related to the constitutional attack on the Price-Anderson Act." *Id.* at 78.

The Supreme Court rejected this argument. It reasoned that for standing purposes it was sufficient that plaintiffs' injuries were traceable to the operation of the nuclear power plant. *Id.* at 75–76. Critically, the Court held that there was no requirement that the plaintiffs show a "subject-matter nexus between the right asserted and the injury alleged." *Id.* The plaintiffs thus had standing even though they were not directly injured by the specific Fifth Amendment violation they alleged.

So too here. Plaintiffs allege that the timeshare agreement is illegal because it violates the MLA and that they were injured as a result of that agreement. Thus, the plaintiffs are required to show only that they were injured as a result of Bluegreen's allegedly illegal conduct (the issuance of

an illegal and void loan). There is no requirement that they show a nexus between their injuries and the particular violations that render Bluegreen's conduct illegal.

Finally, these injuries are redressable by an order of the court. For one, the plaintiffs' monetary losses are "a paradigmatic example of an injury that is redressable by a favorable judicial decision." *Pincus v. Am. Traffic Sols., Inc.*, 986 F.3d 1305, 1310 (11th Cir. 2021). "If the plaintiffs were to prevail on their claims, they could obtain money damages" (or restitution), which "would sufficiently redress their alleged economic harm for purposes of standing." *Wilding*, 941 F.3d at 1126; *see also* 10 U.S.C. § 987(f)(5)(i) (authorizing actual damages). The court could also redress plaintiffs' future injuries by declaring the agreement void. *See* 10 U.S.C. § 987(f)(5)(iii)-(iv) (authorizing "appropriate equitable or declaratory relief" and "any other relief provided by law"). Because the court has the authority both to compensate the plaintiffs for the financial losses they have suffered as a result of Bluegreen's unlawful conduct and to clarify their ongoing legal obligations under the timeshare agreement, the redressability prong is satisfied.

## IV. The district court's holding would undermine the remedial purposes of the Military Lending Act.

Finally, the MLA was enacted out of a desire to protect American military families from predatory lending, and thereby enhance operational readiness and safeguard the national defense. *E.g.*, *Huntco Pawn Holdings, LLC v. U.S. Dep't of Def.*, 240 F. Supp. 3d 206, 211 (D.D.C. 2016) (describing the history and remedial purposes of the statute); 2006 Senate Hearing (statement of Sen. Elizabeth Dole) (attesting that predatory lending "not only creates financial problems for individual soldiers and their families but also weakens our military's operational readiness" and poses "a real threat to our national defense").

Congress recognized that effectuating these purposes required strong enforcement mechanisms. That is why, for example, Congress made any knowing violations of the MLA a crime punishable by imprisonment. 10 U.S.C. § 987(f)(1). That is also why Congress made any contract that violates the MLA "void from [its inception], *id.* § 987(f)(3), and, in doing so, "*unambiguously* confer[red] on covered members of the armed forces and their dependents" the right to "seek restitution on a contract void under the … statute," *Cox*, 625 F. App'x at 457–58 (emphasis added) (cleaned up). And that is why Congress later affirmed the right of servicemembers to

bring suit under the statute by adding an express private right of action and authorizing a broad array of civil remedies. *See* 10 U.S.C. § 987(f)(5).

There is no doubt then that Congress intended for servicemembers to bring suit to challenge the legality of contracts that violate the MLA and to demand the remedies to which they are entitled under the statute. The district court's holding, however, risks substantially curtailing private enforcement of the MLA and limiting servicemembers' ability to vindicate their rights under the statute. It does so by reading the MLA's voiding provision out of the statute and reading into the statute an atextual materiality requirement. But it may be very difficult, if not impossible, for servicemembers to demonstrate that certain MLA violations had a direct effect on their decision to procure a financial product or caused them to pay money they would not otherwise have paid.

Take, for instance, the MLA's arbitration provisions and disclosure requirements, *see* 10 U.S.C. § 987(c). Congress included not one, but two, provisions prohibiting mandatory arbitration. It also made a judgment that certain standardized disclosures benefit servicemembers by allowing them to make informed decisions in the marketplace. But it will likely be difficult for any servicemember to allege that prohibited mandatory arbitration or non-compliant disclosures were the singular cause of their decision to take

out a loan or enter into some other credit arrangement. Absent such allegations, servicemembers will be unable to bring suit and may continue to comply with contractual obligations that Congress has rendered void. And creditors will have little incentive to ensure compliance.

This Court should not substitute its judgment for that of Congress. It should endeavor to ensure that protections that Congress has afforded American servicemembers are enforceable and overturn the district court's misapplication of Article III, which rendered those protections impotent.

## CONCLUSION

For these reasons, the judgment of the district court should be reversed.

November 21, 2022

Respectfully submitted,

/s/ Ryan Cooper
Seth Frotman
   *General Counsel*
Steven Y. Bressler
   *Acting Deputy General Counsel*
Ryan Cooper
   *Senior Counsel*
CONSUMER FINANCIAL PROTECTION
   BUREAU
1700 G Street NW
Washington, DC 20552
(202) 702-7541
ryan.cooper@cfpb.gov

/s/ Bradley Grossman
Anisha S. Dasgupta
   *General Counsel*
Joel Marcus
   *Deputy General Counsel*
Bradley Grossman
   *Attorney*
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave. NW
Washington, DC 20580
(202) 326-2994
bgrossman@ftc.gov

**CERTIFICATE OF COMPLIANCE**

This brief complies with Federal Rule of Appellate Procedure 29(a)(5). The brief is 6,280 words, excluding the portions exempted by Rule 32(f). The brief's typeface complies with Rule 32(a)(5) and (6).

November 21, 2022                  /s/ Ryan Cooper
                                         Ryan Cooper

**CERTIFICATE OF SERVICE**

I certify that on November 21, 2022, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. The participants in this case are registered CM/ECF users and will be served electronically through the CM/ECF system.

November 21, 2022        /s/ Ryan Cooper
                                        Ryan Cooper