# No. 22-12217

## United States Court of Appeals for the Eleventh Circuit

TAMARAH C. LOUIS AND EMMANUEL LOUIS, individually and on behalf of all others similarly situated, *Plaintiffs- Appellants*

*v.*

BLUEGREEN VACATIONS UNLIMITED, INC. AND BLUEGREEN VACATIONS CORP., *Defendants-Appellees*.

On Appeal from the United States District Court for the Southern District of Florida Case No. 21-cv-61938 (The Hon. Rodolfo A. Ruiz II)

## AMICUS BRIEF OF THE MILITARY OFFICERS ASSOCIATION OF AMERICA, THE JEWISH WAR VETERANS OF THE UNITED STATES OF AMERICA, BLUE STAR FAMILIES, JACKSONVILLE AREA LEGAL AID, THE UNITED STATES ARMY WARRANT OFFICERS ASSOCIATION, THE NATIONAL MILITARY FAMILY ASSOCIATION, AND THE FIVE STAR VETERANS CENTER, IN SUPPORT OF APPELLANTS AND IN SUPPORT OF REVERSAL

EMILY GERRICK
  GERSTEIN HARROW LLP
  810 7th St. NE
  No. 301
  Washington, DC 20002
  (202) 670-4809
  emily@gerstein-harrow.com

JASON HARROW
(*counsel of record*)
  GERSTEIN HARROW LLP
  3243 S. La Cienega Blvd.,
  Ste. B
  Los Angeles, CA 90016
  (323) 744-5293
  jason@gerstein-harrow.com

Dated: November 21, 2022

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

All *Amici Curiae* are non-profit entities. None has any parent corporation or publicly held corporation that owns 10% or more of its stock.

The following entities or persons may have an interest in this case:

Blue Star Families, Inc.

Five Star Veterans Center

Gerrick, Emily, as attorney for amici

Jacksonville Area Legal Aid, Inc.

The Jewish War Veterans Of The United States Of America

Harrow, Jason, as attorney for amici

Military Officers Association Of America

National Military Family Association

The United States Army Warrant Officers Association

Amici also incorporate the CIPs filed by the Appellants and other amici.

Dated: November 21, 2022                    /s/ Jason Harrow

                                            Jason Harrow

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT......................................................... i

TABLE OF CONTENTS .............................................................. ii

TABLE OF AUTHORITIES ........................................................ iv

INTEREST OF *AMICI CURIAE* ............................................... 1

STATEMENT OF THE ISSUES ................................................. 4

SUMMARY ............................................................................... 5

STATUTORY BACKGROUND.................................................. 7

I.     The Department of Defense Finds That Service Members Require Special Protection From Predatory Lending and Financial Practices............................................................. 7

II.    Congress Reponds And Passes The MLA With A Unique Provision Voiding Contracts That Violate The Act. ........................ 9

ARGUMENT ............................................................................ 13

THE DISTRICT COURT'S DECISION UNDERMINES ONE OF THE MLA'S MOST IMPORTANT FEATURES AND, IF AFFIRMED, WOULD SUBSTANTIALLY HARM SERVICEMEMBERS AND NATIONAL SECURITY........ 13

I.     As A Result Of The Provision Voiding Illegal Agreements, The MLA Has Been Incredibly Effective. ...................................... 13

II.    The District Court's Decision Undermines This Provision And Puts Our Service Members And Our Country At Risk At A Time Of Record Recruiting Shortfalls. ...................................... 16

CONCLUSION .......................................................................... 19

CERTIFICATE OF COMPLIANCE ........................................................ 20

CERTIFICATE OF SERVICE ............................................................. 21

# TABLE OF AUTHORITIES

## Cases

*FDIC v. 32 Edwardsville, Inc.*, 873 F. Supp. 1474 (D. Kan. 1995) .................................................................. 12

*Garrett v. Branson Commerce Park Cmty. Improvement Dist.*, 645 F. App'x 710 (10th Cir. 2016) ........................ 12

*Large v. Conseco Fin. Servicing Corp.*, 292 F.3d 49 (1st Cir. 2002) .......................................................... 11

*Murray v. Fifth Third Bank*, No. 06-14246, 2007 WL 956916 (E.D. Mich. Mar. 28, 2007) ............................... 11

## Statutes

10 U.S.C. § 987(a) ....................................................... 10

10 U.S.C. § 987(f)(3) ............................................. 4, 5, 11, 13

15 U.S.C. § 1601 ........................................................ 11

15 U.S.C. § 1691 ........................................................ 12

Public Law 109-364 § 670 (Oct. 17, 2006) ............................. 9

## Other Authorities

CONSUMER FEDERATION OF AMERICA, THE MILITARY LENDING ACT FIVE YEARS LATER: IMPACT ON SERVICEMEMBERS, THE HIGH-COST SMALL DOLLAR LOAN MARKET, AND THE CAMPAIGN AGAINST PREDATORY LENDING (May 2012) ................................... 13

FINANCIALLY FIT? COMPARING THE CREDIT RECORDS OF YOUNG SERVICE MEMBERS AND CIVILIANS, CONSUMER FINANCIAL PROTECTION BUREAU (July 2020) .......................... 15

Ian Thomas, *The U.S. Army Is Struggling to Find the Recruits It Needs to Win the Fight Over the Future*, CNBC (Oct. 26, 2022) https://perma.cc/YGN3-LT3V .................... 17

Inflation Calculator, OfficialData.org, https://perma.cc/KLX4-FU8B ........................................................ 18

Mike Saunders, *Here's Why Vets Need to Avoid Predatory Lenders More Than Ever*, MILTARY.COM (Aug. 21, 2020), https://perma.cc/S557-XUGV................................................. 5

Nicole Goodkind, *Predatory Lenders Are Making Money off Rising Gas and Food Prices*, CNN (June 30, 2022), https://perma.cc/VSH6-5V6J.......................................................... 18

U.S. DEPT. OF DEFENSE, REPORT ON PREDATORY LENDING PRACTICES DIRECTED AT MEMBERS OF THE ARMED FORCES AND THEIR DEPENDENTS (Aug. 2006) .......................... 7, 8, 9

U.S. DEPT. OF DEFENSE, REPORT ON THE MILITARY LENDING ACT AND THE EFFECTS OF HIGH INTEREST RATES ON READINESS (May 2021) ............................................................. 10, 14

WILLIAM SKIMMYHORN, THE FINANCIAL WELFARE OF VETERAN HOUSEHOLDS, FINANCIAL INDUSTRY REGULATORY AUTHORITY INVESTOR EDUCATION FOUNDATION (Sept. 2017)............................................... 15

### Regulations

Fed. R. App. P. 29(a)(2) ............................................................... 1

U.S. Dept. of Defense Directive 1344.9, Indebtedness of Military Personnel, October 27, 1984 ............................... 8

# INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* are organizations that represent the interests of United States military service members, veterans, and their families. *Amici* have an interest in ensuring that the Military Lending Act remains intact and effective.

The **Military Officers Association of America** ("MOAA") is a professional association of United States military officers. With more than 350,000 members from every branch of service, MOAA is the nation's largest and most influential association of military officers. It is an independent, nonprofit, politically nonpartisan organization. The association supports government policies that promote a strong national defense and benefit military members and their families. The Military Lending Act is important to MOAA because it supports service members' financial readiness, which helps to ensure service members are able to focus on their mission of defending our country.

---

[1] All parties have consented to the filing of this *amici curiae* brief. *See* Fed. R. App. P. 29(a)(2). Pursuant to Rule 29(a)(4)(E), counsel for *amici curiae* certifies that this brief was not authored in whole or in part by counsel for any party and that no person or entity other than *amici curiae*, its members, or its counsel has made a monetary contribution intended to fund the preparation or submission of this brief.

The **Jewish War Veterans of the United States of America**, organized in 1896 by Jewish veterans of the Civil War, is the oldest active national veterans' service organization in America. Incorporated in 1924, and chartered by an act of Congress in 1983, *see* 36 U.S.C. § 110103, the organization's statutory objectives include "encourage[ing] the doctrine of universal liberty, equal rights, and full justice to all," *id* § 110103(5), and "preserv[ing] the spirit of comradeship by mutual helpfulness to comrades and their families," *id* § 110103(7).

**Blue Star Families** was founded in 2009 by military spouses to strengthen and empower military and Veteran families to thrive as they serve. With more than 230,000 members in its network, Blue Star Families has had a positive impact on more than 1.5 million military families. The Military Lending Act is a crucial piece of legislation protecting the interests of military families and the United States of America, and Blue Star Families therefore has a strong interest in protecting it.

**Jacksonville Area Legal Aid** ("JALA") is a nonprofit law firm that provides free legal services to people who cannot otherwise afford representation. JALA serves an area with multiple military bases, and it

frequently represents people in military lending cases that are referred to JALA by the U.S. Navy Judge Advocate General and others. JALA also has a Veterans Services Unit that assists hundreds of veterans a year.

The **United States Army Warrant Officers Association** is a veterans service organization that was incorporated as a nonprofit organization in 1974. It is devoted to the welfare of army warrant officers—serving, former, and retired—and their families. The organization supports the Military Lending Act because it is an important piece of legislation that advances the welfare of army warrant officers and their families.

The **National Military Family Association** is a nonprofit organization founded in 1969. It is a voice for military families representing all ranks and services. Through the support and programs it provides, and its respected voice on Capitol Hill and with the Departments of Defense and Veterans Affairs, it represents the best interests of families who serve. As an expert on the issues facing military families, the National Military Family Association recognizes the importance of preserving the Military Lending Act.

The **Five Star Veterans Center** is a nonprofit that honors the sacrifices of combat veterans by providing the services and support they need to succeed in civilian life. The organization has a specific focus on veterans aged 22 through 55 suffering from post-traumatic stress disorder, traumatic brain injuries, depression, anxiety and other related mental health issues. Indebtedness can exacerbate many of the hardships veterans face, including mental health issues and housing insecurity. The Five Star Veterans Center therefore has a strong interest in ensuring that the Military Lending Act is not undermined or weakened in any way.

## STATEMENT OF THE ISSUES

Did the district court err in holding a contract that violated provisions of the Military Lending Act could nonetheless be enforced, despite language in the Act providing that any contract violating its provisions is "void from the inception of such a contract," 10 U.S.C. § 987(f)(3)?

## SUMMARY

The Military Lending Act (the "MLA") stops predatory lenders from targeting active duty military service members and their families, and was enacted for two reasons, both of which are of paramount importance to *Amici*: 1) to protect service members; and 2) to protect the national security of the United States of America.

For these compelling reasons, Congress added provisions that make the MLA far stronger than similar consumer protection legislation that applies to more people than military personnel. One provision in particular is crucial to the MLA's impact: Section 987(f)(3) provides that any contract that violates the MLA is "void from the inception of such a contract." 10 U.S.C. § 987(f)(3).

This key provision makes the rest of the MLA uniquely effective by providing a clear statutory remedy to people who fall victim to predatory lending. Under § 987(f)(3), military personnel may void illegally made contracts. As a result, the MLA has been described as "arguably the most successful federal consumer protection law on the books." Mike Saunders, *Here's Why Vets Need to Avoid Predatory Lenders More Than Ever*, MILTARY.COM (Aug. 21, 2020), https://perma.cc/S557-XUGV. The data is

compelling that "the MLA has decreased the number of active duty servicemembers who need . . . to get out of trouble with payday loans by approximately 99.8%." *Id.*

This provision voiding contracts from the outset is also a key feature setting the MLA apart from less effective consumer protection legislation passed by Congress. For example, neither the Truth in Lending Act, 15 U.S.C. § 1601, nor the Equal Credit Opportunity Act, 15 U.S.C. § 1691, contain such a provision, and as a result courts have found that contracts violating those statutes can still be enforced. *See infra at* 11. Congress intended something different, and stronger, for American military personnel.

The District Court in this case held that a contract that violated multiple provisions of the MLA could still be enforced, effectively ruling that § 987(f)(3), the key provision setting the MLA apart from other consumer protection legislation, is meaningless. If this decision is not reversed, predatory lenders will realize they can return to military bases *en masse*, ignore all of the MLA's protections, and only have to worry about lawsuits from the small minority of victims able to prove reliance on specific statutory violations.

# STATUTORY BACKGROUND

## I. The Department of Defense Finds That Service Members Require Special Protection From Predatory Lending and Financial Practices.

In 2006, the Department of Defense released a report on the prevalence of predatory lending practices targeting active Service members and their dependents. U.S. DEPT. OF DEFENSE, REPORT ON PREDATORY LENDING PRACTICES DIRECTED AT MEMBERS OF THE ARMED FORCES AND THEIR DEPENDENTS (Aug. 2006). The report contained a call to action to Congress to pass legislation to combat these practices, which led to the Military Lending Act.

In its 2006 report, the Department of Defense explained that recent lending practices had negatively impacted both individual servicemembers and undermind national security. The report found that active service members and their families

> have characteristics that can make them a market of choice for predatory lenders. Forty-eight percent of enlisted Service members are less than 25 years old, typically without a lot of experience in managing finances, and without a cushion of savings to help them through emergencies. They are on their own without the guidance or assistance of family, with perhaps their first significant paycheck. They are paid regularly and are not likely to be downsized, outsourced or to quit their employment.

*Id.* at 10. At the same, this vulnerable population was subject to restrictions not applicable to the general population, because the U.S. Military has policies "explicitly stating that Service members are to pay their just debts." *Id. at* 3 (citing U.S. Dept. of Defense Directive 1344.9, Indebtedness of Military Personnel, October 27, 1984).

Indeed, the Department of Defense and top-ranking Military leadership at the time recognized that "predatory lending undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all volunteer fighting force." *Id. at* 9. Four Star General and Commandant of the Marine Corp Michael William Hagee issued a statement explaining that "financial readiness directly impacts unit readiness and, consequently, the corps' ability to accomplish its mission." *Id. at* 82 (typeface setting altered). Likewise, Four Star Admiral and Commandant of the U.S. Navy John C. Harvey, Jr. stated that he was "concerned with the number of sailors who are taken advantage of by predatory lending practices," which harm "the Navy's ability to accomplish its mission." *Id*. at 84 (typeface setting altered).

Top leaders repeatedly emphasized that many civilians fail to understand why excessive indebtedness is a unique, and uniquely

harmful, problem for the Armed Forces. For instance, U.S. Navy Commanding Officer Captain Mark D. Patton told Congress he was "concerned that many do not understand why military service members—and their families—require special consideration when it comes to these predatory establishments." *Id.* at 86. So he put the danger in start terms: "Between 2000 and 2005, revoked or denied security clearances for Sailors and Marines due to financial problems [had] increased 1,600 percent." *Id.* at 86. He called this "an unacceptable loss of valuable talent and resources" and said simply: we "MUST protect our protectors." *Id.*

## II. Congress Reponds And Passes The MLA With A Unique Provision Voiding Contracts That Violate The Act.

Congress quickly responded. Given the importance of, and bipartisan support for, the issue, Congress added the Military Lending Act to the Defense Authorization Act for Fiscal 2007. The Act was passed unanimously in the Senate and with only 23 dissenting votes in the House, and then signed by President George W. Bush in October 2006. *See* Public Law 109-364 § 670 (Oct. 17, 2006).

As enacted, the MLA contains six core protections for "covered member[s] of the armed forces or a dependent of such a member." 10 U.S.C. § 987(a). It (1) "[e]stablishes an annual percentage rate limit of 36 percent, to include all fees and charges, credit insurance, and other ancillary products sold with the extension of credit"; (2) "[r]equires disclosures of annual percentage rate and payment obligations"; (3) "[p]rohibits a lender from requiring a borrower to use a personal check, debit authorization, wage allotment, or vehicle title to secure credit"; (4) "[r]equires states to apply state consumer protections to nonresident Service members and dependents residing within the state"; (5) "[p]rohibits a lender from requiring arbitration, unreasonable legal notice provisions, or waiving rights under law"; and (6) "[p]rohibits a lender from refinancing, renewing, or consolidating existing credit issued by the same lender." U.S. DEPT. OF DEFENSE, REPORT ON THE MILITARY LENDING ACT AND THE EFFECTS OF HIGH INTEREST RATES ON READINESS (May 2021), *at* 3.

These are strong substantive protections that further the interest in national security and military readiness. But what makes them particularly effective is Section 987(f)(3), which provides that "[a]ny

credit agreement, promissory note, or other contract prohibited under this section is void from the inception of such contract." 10 U.S.C. § 987(f)(3). Congress thus made a clear statement: lenders and those who would enter into transactions with servicemembers either follow the rules or risk having the entire agreement be found null and void.

This unique provision of the MLA stands in stark contrast with the enforcement provisions of other consumer protection statutes. For instance, the Truth in Lending Act (often referred to as "TILA") is a statute of broad applicability similar in spirit to the MLA, though not limited only to servicemembers. *See* 15 U.S.C. § 1601. While TILA contains many important consumer protections, it lacks a provision voiding contracts that violate its terms. As a result, courts have held that contracts that violate the Truth in Lending Act are often nonetheless enforceable. *See, e.g., Large v. Conseco Fin. Servicing Corp.*, 292 F.3d 49, 54 (1st Cir. 2002) (noting that TILA does not establish "that a borrower's mere assertion of the right of rescission has the automatic effect of voiding the contract)"; *Murray v. Fifth Third Bank*, No. 06-14246, 2007 WL 956916, at *2 (E.D. Mich. Mar. 28, 2007) ("The court is aware of no authority providing that an otherwise validly executed promissory note

and mortgage are rendered null and void by a failure to make disclosures required by TILA.").

Nor is any such provision is found in the Equal Credit Opportunity Act, another major Federal consumer protection act. 15 U.S.C. § 1691. As with TILA—but in contrast to the MLA—courts have also found that contracts violating that Act's protections are often still enforceable. *See, e.g.*, *FDIC v. 32 Edwardsville, Inc.*, 873 F. Supp. 1474, 1480 (D. Kan. 1995) ("Although the ECOA allows courts to grant equitable and declaratory relief, courts interpreting that provision have concluded that the language does not grant courts the power to invalidate underlying obligations.") (internal citation omitted); *Garrett v. Branson Commerce Park Cmty. Improvement Dist.*, 645 F. App'x 710, 712 (10th Cir. 2016) (noting that plaintiffs did not attempt to show that "ECOA's declaratory remedies include the power to declare contracts void from inception, despite at least some authority seeming to suggest the opposite view.").

But the MLA, with its provision voiding *ab initio* illegal contracts, is different and unique. That is because servicemembers and their families themselves are different and unique: their falling into deep debt

is not just damaging to themselves and their communities, it is damaging to the entire military and to national security broadly.

## ARGUMENT

### THE DISTRICT COURT'S DECISION UNDERMINES ONE OF THE MLA'S MOST IMPORTANT FEATURES AND, IF AFFIRMED, WOULD SUBSTANTIALLY HARM SERVICEMEMBERS AND NATIONAL SECURITY

### I. As A Result Of The Provision Voiding Illegal Agreements, The MLA Has Been Incredibly Effective.

The MLA's effectiveness since its passage is beyond dispute. A study by the Consumer Federation of America in 2012 showed a 70 percent drop in the number of payday loan outlets surrounding Camp Pendleton in California. CONSUMER FEDERATION OF AMERICA, THE MILITARY LENDING ACT FIVE YEARS LATER: IMPACT ON SERVICEMEMBERS, THE HIGH-COST SMALL DOLLAR LOAN MARKET, AND THE CAMPAIGN AGAINST PREDATORY LENDING (May 2012), *at* 9. The same report also found that relief societies reported a "sharp drop in the number of clients needing financial assistance" and that "State regulators report few violations" of the MLA. *Id.* This is likely due in large part to the clear private remedy that active Service members have under 10 U.S.C. § 987(f)(3). Lenders that would take advantage of military personnel do so at great risk—

their contracts are voided *ab initio*—so they are unlikely to take that risk. They thus comply with the MLA, and servicemembers are protected.

In 2021, the Department of Defense released a report monitoring the effectiveness of the MLA from its passage in 2006. Department of Defense officials are trained to look at things skeptically and advocate vocally for America's national security interests. But it found few things to complain about the MLA. It concluded that:

> [T]he MLA is currently working as intended. . . . Survey results generally reflect decreased use of high-cost credit products and improved financial condition among Service members over time. Engagements with DoD financial educators and counselors indicate fewer seek assistance for financial challenges or debt resulting from high-cost credit products. Military aid societies, which provide financial assistance, similarly report fewer requests for assistance related to high- cost credit products. . . . Overall, the MLA . . . appears to be effective in deterring unfair credit practices, ensuring Service members and families have continued access to affordable and responsible credit, and sustaining financial readiness in support of the Department's National Defense Strategy.

2021 DoD Report *at* 7.

The report also noted that, as a result of the MLA, "some online lenders that traditionally targeted the military population and charged exorbitant interest rates have modified their lending practices to comply with the MLA's cost of credit limit." *Id*. at 15.

Relying on a study conducted by the Consumer Financial Protection Bureau,[2] the Department of Defense further concluded that "the credit scores of active duty Service members overall compare favorably to those of civilians." *Id.* at 10. This is especially significant given that veterans, who are not protected under the MLA after they leave the military, are significantly more likely to have "problematic credit," have missed a mortgage payment, or be underwater on their home. WILLIAM SKIMMYHORN, THE FINANCIAL WELFARE OF VETERAN HOUSEHOLDS, FINANCIAL INDUSTRY REGULATORY AUTHORITY INVESTOR EDUCATION FOUNDATION (Sept. 2017). While the lack of coverage for veterans no doubt leads to this unfortunate disparity, there remain unique national security needs to protect servicemembers and their families. Thus, the Report affirmed that:

> While financial issues are a personal experience, an individual Service member's financial readiness has an associated impact on the ability of that member's unit to continue fulfilling their mission. In addition, data from the Department's annual Status of Forces Survey found that Service members who experienced a financial management challenge in the previous 12 months, were slightly more likely to indicate they were unlikely to remain on active duty,

---

[2] FINANCIALLY FIT? COMPARING THE CREDIT RECORDS OF YOUNG SERVICE MEMBERS AND CIVILIANS, CONSUMER FINANCIAL PROTECTION BUREAU (July 2020).

> reflecting a potential relationship between personal finances
> and retention, as the Department has long maintained."

*Id.* at 15.

In sum, if the 2021 DoD report were providing a Yelp review of the MLA, the law would have received 5 out of 5 stars. As things stood in 2021, the MLA successfully protected individual servicemembers and their families from entering debt spirals that negatively impact unit readiness and national security. The voidability provision in § 987(f)(3) was critical to that success.

## II. The District Court's Decision Undermines This Provision And Puts Our Service Members And Our Country At Risk At A Time Of Record Recruiting Shortfalls.

The Defendants in this case violated the MLA in several ways: they misrepresented the interest rate, failed to provide required written and oral disclosures, and included an arbitration clause, all of which the Military Lending Act explicitly prohibits. The District Court held that those violations did not matter because the plaintiffs did not prove that they would have made a different decision if it were not for those violations. This renders meaningless Section 987(f)(3) of the MLA, which

provides that any contract that violates the MLA is "void from the inception of such a contract."

The District Court's decision risks effectively repealing from the bench one of the MLA's most critical provisions, thereby undoing all of the progress made in the last fifteen years. This Court must reverse to ensure that does not happen.

In particular, if the District Court's decision is not reversed, predatory lending companies will once again focus their marketing efforts and resources on active Service members. That will result in a return to a time before the MLA, when thousands upon thousands of Service members lose their security clearances or leave the Military due to financial hardship stemming from predatory lending. *See supra* at 9.

*Amici* are particularly concerned of this problem at a time when the United States Military is already experiencing recruiting shortfalls. This year, U.S. Army fell short of its recruitment goal by 25 percent, and "recently cut its projection for its total force for this year by 10,000." Ian Thomas, *The U.S. Army Is Struggling to Find the Recruits It Needs to Win the Fight Over the Future*, CNBC (Oct. 26, 2022) https://perma.cc/YGN3-LT3V. *Amici* are therefore exceedingly concerned

about any decision that undermines the effectiveness of the MLA, which has proved to be an important tool in keeping service members from being discharged for failing to pay debts.

The current inflationary environment will only exacerbate the problem. In 2006, when the MLA was passed, inflation was 3.23 percent. Inflation Calculator, OfficialData.org, https://perma.cc/KLX4-FU8B. Today it has reached a 40 year high at over 7.7 percent. *Id*. As one CEO of a payday lending company explained during an earnings call this May, "[l]ow unemployment plus inflation generally mean consumers may need loans for additional capital to manage through unexpected spikes and expenses while earning money to pay back these loans. Nicole Goodkind, *Predatory Lenders Are Making Money off Rising Gas and Food Prices*, CNN (June 30, 2022), https://perma.cc/VSH6-5V6J. His company beat earnings estimates that quarter by nearly eight percent. *Id*.

As people struggle to meet their basic needs, the payday lending business is booming. If the MLA's effectiveness is undermined, payday lenders will expand once again to military bases and their surroundings. That makes the present day one of the worst possible times to roll back enforcement mechanisms in the MLA.

For years, *Amici* have been advocating for increased consumer protections for Service members and veterans. Allowing the District Court's decision to stand would instead gut a key provision of the MLA at a time when it is needed most.

## CONCLUSION

The District Court's decision should be reversed.

Dated: November 21, 2022

Respectfully submitted,

*/s/ Jason Harrow*
JASON HARROW
GERSTEIN HARROW LLP
3243 S. La Cienega Blvd., Ste. B
Los Angeles, CA 90016
(323) 744-5293
jason@gerstein-harrow.com

EMILY GERRICK
GERSTEIN HARROW LLP
801 7th St. NE
No. 301
Washington, DC 20002
(202) 670-4809
emily@gerstein-harrow.com

*Attorneys for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

Counsel certifies that this brief complies with the word limitation set forth in Rules 29(a)(5) and 21(d)(1) because it contains 3,537 words. According to the word-processing system used to prepare this brief, calculating by the word processing system used in its preparation, and excluding the parts of the brief exempted by Fed. R. App. P. 32(f)

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Century Schoolbook 14-point font.

<u>/s/ Jason Harrow</u>

*Attorney for Amici Curiae*

**CERTIFICATE OF SERVICE**

I certify that on November 21, 2022, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. The participants in this case are registered CM/ECF users and will be served electronically through the CM/ECF system.


November 21, 2022                    /s/ Jason Harrow

                                     *Attorney for Amici Curiae*