**CASE NO. 22-12217**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

TAMARAH C. LOUIS and EMMANUEL LOUIS, JR., individually and on
behalf of those similarly situated,

Plaintiffs-Appellants,

v.

BLUEGREEN VACATIONS UNLIMITED, INC., a Florida corporation and
BLUEGREEN VACATIONS CORPORATION, a Florida corporation,

Defendants-Appellees.

On Appeal from the United States District Court
for the Southern District of Florida
Case No. 21-cv-61938 (The Hon. Rodolfo A. Ruiz, II)

============================================================
**APPELLEES' BRIEF**
============================================================

Grace L. Mead
Andrea N. Nathan
Jenea M. Reed
Joseph J. Onorati
**STEARNS WEAVER MILLER**
Museum Tower
150 West Flagler Street
Suite 2200
Miami, Florida 33130
Telephone: (305) 789-3200
Email: gmead@stearnsweaver.com
Email: anathan@stearnsweaver.com
Email: jreed@stearnsweaver.com
Email: jonorati@stearnsweaver.com

*Attorneys for Defendants-Appellees*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the following is an alphabetical list of trial judges, attorneys, persons, firms, partnerships, and corporations known to have an actual or potential interest in the outcome of the proposed interlocutory appeal:

Abdo, John E. (Vice Chair of Board of Directors of Bluegreen Vacations Corporation)

Bennett, Jennifer D. (Appellants' counsel)

Bluegreen Vacations Unlimited, Inc. (Appellee)

Bluegreen Vacations Corporation (Appellee)

Bluegreen Vacations Holding Corporation (NYSE: "BVH") (holding company of Bluegreen Vacations Corporation)

Gupta Wessler PLLC (Appellants' counsel)

Levan, Alan (CEO and Chair of Board of Directors of Bluegreen Vacations Corporation)

Louis, Jr., Emmanuel G. (Appellant)

Louis, Tamarah C. (Appellant)

Mead, Grace Lee (Appellees' counsel)

Nathan, Andrea Naomi (Appellees' counsel)

National Association of Consumer Advocates (Appellants' counsel)

Onorati, Joseph James (Appellees' counsel)

Peterson, Matthew T. (Appellants' counsel)

Reed, Jenea M. (Appellees' counsel)

Rheingold, Ira (Appellants' counsel)

Ruiz, II, Hon. Rodolfo A. (District Court Judge)

Stearns Weaver Miller Weissler Alhadeff & Sitterson, PA (Appellee's counsel)

Varnell & Warwick, P.A. (Appellants' counsel)

Varnell, Janet R. (Appellants' counsel)

Warwick, Brian W. (Appellants' counsel)

Willis, Erika R. (Appellants' counsel)

Woodbridge Holdings, Corp. (Appellees' affiliate)

***

Bluegreen Vacations Unlimited, Inc. ("Bluegreen") is a wholly owned subsidiary of Bluegreen Vacations Corporation ("Bluegreen Vacations"). Bluegreen Vacations Holding Corporation, a publicly held corporation trading on the New York Stock Exchange under the symbol "BVH," owns over 10% of the stock of Bluegreen Vacations.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not necessary because binding precedent, including *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (June 25, 2021), compelled the dismissal of the First Amended Class Action Complaint for lack of standing. Plaintiffs alleged only bare procedural violations of the Military Lending Act, divorced from any concrete harm.

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT OF THE ISSUES................................................................1

STATEMENT OF THE CASE................................................................2

    A.    The Operative Complaint ................................................................2

        1.    Bluegreen ................................................................2

        2.    Plaintiffs Emmanuel and Tamarah Louis ......................................2

        3.    The Incorporated Promissory Note, Mortgage, and Closing Disclosures................................................................5

        4.    The "Counts" and Proposed Class................................................7

    B.    Dismissal ................................................................8

        1.    The Magistrate Judge's Report and Recommendation ................8

        2.    The District Court's Order Affirming and Adopting Report and Recommendation ................................................................10

    C.    Plaintiffs' Depositions................................................................13

        1.    The Louises admitted that their reasons for the purchase had nothing to do with the financial disclosures. ........................13

        2.    The Louises admitted that any additional financial disclosures would not have made a difference.............................14

SUMMARY OF THE ARGUMENT ................................................................16

ARGUMENT ................................................................18

I.    The District Court and Magistrate Judge Correctly Concluded that Plaintiffs Lacked Article III Standing ................................................................18

    A.    No Injury-in-Fact................................................................18

1. On its face, the First Amended Complaint fails to plead any injury-in-fact..................................................................19

2. The Promissory Note and closing disclosures incorporated by reference foreclose any allegations of an injury-in-fact. ......22

3. Plaintiffs' depositions confirmed that they have not suffered an injury-in-fact...........................................................24

4. Following *Spokeo*, this Court has repeatedly ruled Plaintiffs who allege procedural violations "divorced from any concrete harm" under similar consumer protection statutes lack standing................................................................25

5. Appellants' and Amici's arguments about the benefit of the bargain are contrary to governing law. ...............................28

6. Appellants' and Amici's arguments about void contracts are contrary to governing law. ...................................................30

B. No Causation or Redressability.........................................................32

II. Plaintiffs' Failure to State a Claim Provides Additional Grounds for Dismissal..................................................................................................35

A. The Statute Exempts Transactions Involving Residential Mortgages.......................................................................................36

B. Legislative History Supports Exempting Timeshare Financing from the Definition of "Consumer Credit" .........................................38

III. Exercising Article III Jurisdiction over this Case Would Disserve the Purposes of the Military Lending Act and Would Contravene Constitutional Limits on the Jurisdiction of the Federal Courts ..................42

CONCLUSION ..................................................................................................44

CERTIFICATE OF COMPLIANCE....................................................................46

CERTIFICATE OF SERVICE ............................................................................47

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron Private Clinic Management LLC v. Berry*,
  912 F.3d 1330 (11th Cir. 2019) ......................................................35

*Bowen v. First Family Financial Services, Inc.*,
  233 F.3d 1331 (11th Cir. 2000) ...............................................21, 22

*Chiles v. Thornburgh*,
  865 F.2d 1197 (11th Cir. 1989) ......................................................33

*Church of Scientology of California v. IRS*,
  484 U.S. 9 (1987).............................................................................42

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013).................................................................18, 44

*Collins v. Yellen*,
  141 S. Ct. 1761 (2021).............................................................32, 33

*Comparelli v. Republica Bolivariana De Venezuela*,
  891 F.3d 1311 (11th Cir. 2018) ......................................................23

*Cooper v. Atlantic Credit & Finance Inc.*,
  822 F. App'x 951 (11th Cir. 2020)...........................................11, 27

*Corbett v. TSA*,
  930 F.3d 1225 (11th Cir. 2019) ...............................................21, 24

*Cordoba v. DIRECTV*,
  942 F.3d 1259 (11th Cir. 2019) ......................................................32

*Czyzewski v. Jevic Holding Corp.*,
  580 U.S. 451 (2017).........................................................................29

*Daewoo Motor America v. General Motors*,
  459 F.3d 1249 (11th Cir. 2006) ........................................................5

*Danvers Motor Co. v. Ford Motor Co.*,
  432 F.3d 286 (3d Cir. 2005) ...........................................................30

*Debernardis v. IQ Formulations, LLC*,
   942 F.3d 1076 (11th Cir. 2019) ..........................................................29

*Dep't. of Commerce v. U.S. House of Representatives*,
   525 U.S. 316 (1999)............................................................................42

*Desert Citizens against Pollution v. Bisson*,
   231 F.3d 1172 (9th Cir. 2000) ............................................................34

*Doss v. General Mills, Inc.*,
   816 F. App'x. 312 (11th Cir. 2020)....................................................29

*Dubuisson v. Stonebridge Life Insurance Co.*,
   887 F.3d 567 (2d Cir. 2018) ...............................................................32

*Duke Power Company v. Carolina Environmental Study Group*,
   438 U.S. 59 (1978)..............................................................................33

*Financial Security Assurance, Inc. v. Stephens, Inc.*,
   500 F.3d 1276 (11th Cir. 2007) .............................................................5

*Florida Ass'n of Medical Equipment Dealers v. Apfel*,
   194 F.3d 1227 (11th Cir. 1999) ..........................................................32

*Friedman v. Market Street Mortg. Corp.*,
   520 F.3d 1289 (11th Cir. 2008) ..........................................................23

*Golan v. FreeEats.com, Inc.*,
   930 F.3d 950 (8th Cir. 2019) ..............................................................11

*Graham v. Catamaran Health Solutions LLC*,
   940 F.3d 401 (8th Cir. 2017) ..............................................................32

*Hill v. Resurgent Capital Services, L.P.*,
   2020 WL 4429254 (S.D. Fla. July 31, 2020) .....................................27

*Jones v. The Salvation Army*,
   2019 WL 6051437 (M.D. Fla. Nov. 15, 2019).....................................28

*London v. Wal-Mart Stores, Inc.*,
   340 F.3d 1246 (11th Cir. 2003) ..........................................................31

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)......................................................................18

*Moody v. Holman*,
    887 F.3d 1281 (11th Cir. 2018) ...........................................33

*MSPA Claims 1 v. Tenet Florida*,
    918 F.3d 1312 (11th Cir. 2019) ...........................................29

*Muransky v. Godiva Chocolatier, Inc.*,
    979 F.3d 917 (11th Cir. 2020) (en banc) ......................*passim*

*Preisler v. Eastpoint Recovery Group, Inc.*,
    2021 WL 2110794 (S.D. Fla. May 25, 2021)......................27

*SFM Holdings v. Banc of America Securities*,
    600 F.3d 1334 (11th Cir. 2010) .............................................5

*Simon v. Eastern Kentucky Welfare Rights Organization*,
    426 U.S. 26 (1976)................................................................32

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)......................................................*passim*

*Stacy v. Dollar Tree Stores, Inc.*,
    274 F. Supp. 3d 1355 (S.D. Fla. 2017)...........................11, 28

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)..............................................................18

*Taylor v. Polhill*,
    964 F.3d 975 (11th Cir. 2020) .............................................33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................5

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (June 25, 2021) ...................................*passim*

*Trichell v. Midland Credit Mgmt., Inc.*,
    964 F.3d 990 (11th Cir. 2020) .....................................*passim*

*Tsao v. Captiva MVP Rest. Partners, LLC*,
    986 F.3d 1332 (11th Cir. 2021) .............................................................8, 9, 19, 29

*United States v. Mortgage Investors Corporation*,
    987 F.3d 1340 (11th Cir. 2021) ...........................................................30

*Walters v. Fast AC, LLC*,
    __ F. 4th __, 2023 WL 1771643 (11th Cir. 2023).......................................34, 35

*Walters v. Fast AC, LLC*,
    540 F. Supp. 3d 1112 (M.D. Fla. 2021).................................................11, 28, 35

*Wendt v. 24 Hour Fitness USA*,
    821 F.3d 547 (5th Cir. 2016) .............................................................30

*Wildearth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013)...........................................................33

*Wilding v. DNC Services Corp.*,
    941 F.3d 1116 (11th Cir. 2021) .................................................33, 35

**Statutes**

10 U.S.C. § 987 et seq.................................................................*passim*

15 U.S.C. § 1638 et seq.................................................................*passim*

15 U.S.C. § 1681 et seq.................................................................11, 27

15 U.S.C. § 1692 et seq.................................................................11, 26

Fla. Stat. § 721.07(6)...................................................................3

**Rules and Regulations**

32 C.F.R. § 232.3 ......................................................................36, 38

32 C.F.R. § 232.4 ......................................................................23

32 C.F.R. § 232.9 ......................................................................8

72 FR 18157-01 ........................................................................39, 43

79 FR 58602-01 ........................................................................40, 41, 42

80 FR 43560-01 ...................................................................41

Fed. R. App. P. 26.1 ............................................................1

Fed. R. App. P. 32 ..............................................................46

Fed. R. Civ. P. 12 ..............................................................35

**Other Authorities**

United States Constitution Article III ...............................*passim*

## STATEMENT OF THE ISSUES

1.      Should this Court affirm the dismissal of the First Amended Complaint for failure to allege any "concrete injury" under Article III where it failed to plausibly allege facts showing that the omission of any disclosures required by the Military Lending Act impacted Plaintiffs in any way?

2.      Should this Court affirm the dismissal of the First Amended Complaint where it failed to allege any injury fairly traceable to allegedly unlawful acts of Bluegreen under Article III because it fails to allege facts showing any causal connection between alleged violations of the Military Lending Act and Plaintiffs' payments to Bluegreen?

3.      Should this Court affirm dismissal where the deposition transcripts cited by Plaintiffs confirm that (a) they suffered no injury-in-fact from any disclosure deficiencies and (b) their purchase decision had nothing do with any disclosures?

4.      Should this Court affirm the dismissal of the First Amended Complaint, on other grounds, because the Military Lending Act exempts the transaction here along with other residential mortgages?[1]

---

[1] References to "DE __" are to docket entries. Emphasis is added and internal citations and quotations are omitted unless otherwise indicated. Defendants, Appellees here, are Bluegreen Vacations Unlimited, Inc. and Bluegreen Vacations Corporation (collectively, "Bluegreen").

## STATEMENT OF THE CASE

### A.  The Operative Complaint

On September 14, 2021, the Louises filed suit in this action. DE 1. After Bluegreen moved to dismiss that complaint, DE 9, the Louises filed their operative First Amended Complaint, DE 16. It includes the following allegations and attaches, or incorporates by reference, the following documents:

#### 1.  Bluegreen

Bluegreen is a vacation ownership or timeshare company that offers vacation and travel services to consumers through ownership in the Bluegreen Vacation Club, a multi-site timeshare plan established under a trust agreement. *See* DE 16 ¶¶ 2, 4, 5. As part of the sales process, purchasers enter into an Owner Beneficiary Agreement ("OBA") with Bluegreen, where they purchase an interest in real estate described as the "Property." DE 16 at 27. They then become "owner beneficiaries" under the terms of a trust agreement and receive vacation points for use at Bluegreen resorts throughout the United States. *See* DE 16 ¶ 5.

#### 2.  Plaintiffs Emmanuel and Tamarah Louis

Plaintiffs Emmanuel G. Louis, Jr. and his spouse Tamarah Louis allege that, on December 20, 2020, they purchased a timeshare interest by entering into an OBA. DE 16 ¶ 4. The Terms and Conditions of their OBA make clear: "[t]he timeshare interest being sold and acquired hereunder consists of the Property," which is a specific week at a specific "condominium unit" at the Resort at World Golf Village

2

in St. Augustine, Florida—Condominium Unit 214 / Vacation Week No. 13O:

> The Vacation Points represent the opportunity to use and enjoy Accommodations and Facilities subject to the Trust Agreement and have been determined in relation to current occupancy demand for the below described Property. The Property is defined as Vacation/Unit Week No. or as an undivided interest in a particular phase of the Resort as may be further described in the deed for such Property:
>
> Resort Name: **THE RESORT AT WORLD GOLF VILLAGE CONDOMINIUM**  Resort Address: **335 S. LEGACY, ST. AUGUSTINE, FL 32092**
>
> Accommodation(s) consisting of: Condominium Unit  No. / Vacation Week No. [together with "F" (Full Timeshare Interest) or "E" or "O" (Biennial Timeshare Interest/Even or Odd)]:  **214/13O**

DE 16 at 27.

Plaintiffs' OBA also disclosed "PURCHASE TERMS" that included an "Administrative Fee" of "$450." DE 16 at 28. Immediately below the "Purchase Terms," the Louises initialed next to a line that indicated that they "have reviewed and agreed to the Purchase Terms above." DE 16 at 28.

The OBA also disclosed in bolded, all-capitalized letters a 10-day right of rescission:

> *You may cancel this contract without any penalty or obligation within ten (10) calendar days after the date you sign this contract* or the date on which you receive the last of all documents required to be given to you pursuant to Section 721.07(6), Fla Statutes, whichever is later. If you decide to cancel this contract, you must notify the seller in writing of your intent to cancel.

DE 16 at 29 (original emphasis removed; italics added).

The Louises alleged that the MLA governed the OBA because Mr. Louis was and is on active duty with the United States Army. DE 16 ¶ 4. And they alleged that Bluegreen did not provide the following legal disclosures, reciting the language of the Military Lending Act and its implementing regulations:

- A statement of the Military Annual Percentage Rate ("MAPR")

applicable to the extension of credit;

- Any disclosure Regulation Z requires made in accordance with the applicable Regulation Z provisions; and

- A clear description of the payment obligation, which can be either a payment schedule for closed-end credit, or account opening disclosures consistent with Regulation Z for open-end credit, as applicable.

DE 16 at ¶ 21. The First Amended Complaint further alleged that the OBA improperly included an arbitration provision. *See also* DE 16 ¶¶ 42-43.

The First Amended Complaint also alleged—contrary to the documents incorporated by reference and the governing regulations, *see* pp. 5-7, 22-24, below—that "the identifiable credit-related cost Bluegreen Vacations financed was an Administrative fee ($450.00)." DE 16 ¶ 79. As a result, it alleged that "the true cost" of Plaintiffs' credit and "MAPR was 1.107% higher than what was listed in the TILA disclosures" as the APR or Annual Percentage Rate. DE 16 ¶ 79. But even the First Amended Complaint conceded, as the statute and regulations required, that the MAPR need not be disclosed as a "numerical value or dollar amount" as long as it "describe[s] any charges you may impose, consistent with the MLA and terms of the agreement, to calculate the MAPR." DE 16 ¶ 21.

### 3. The Incorporated Promissory Note, Mortgage, and Closing Disclosures

Neither the Plaintiffs nor amici contest that the Magistrate Judge properly considered Plaintiffs' Promissory Note and the accompanying closing disclosures.[2]

The Promissory Note disclosed "payments will be in the amount of U.S. $179.81" and "payments of Principal and Interest will be applied first to scheduled interest then due, second to scheduled Principal, third to any fees due under the terms of the Note and then to reduce the unpaid Principal under this Note." DE 27-1 ¶ 3(B). It also addressed potential late fees, fees for payments made with insufficient funds, payments made before they are due, changes in the payment schedule and amount, and default and its consequences. DE 27-1 ¶ 3(C-D), ¶¶ 5-7. The Promissory Note also provided: "In no event shall the amount of interest due or payment in the nature

---

[2] On a motion to dismiss, "courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). "[T]he district court may consider an extrinsic document if it is (1) central to plaintiff's claim; and (2) its authenticity is not challenged." *SFM Holdings v. Banc of America Securities*, 600 F.3d 1334, 1337 (11th Cir. 2010).

*See also , e.g., Financial Security Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284-85 (11th Cir. 2007) (considering an insurance policy, even though the complaint did not discuss its specific provisions, when analyzing a motion to dismiss a federal securities claim)*; Daewoo Motor America v. General Motors*, 459 F.3d 1249, 1266 n.11 (11th Cir. 2006) (ruling master transaction agreement and distribution agreement were integral to antitrust allegations and therefore district court properly considered them on a motion to dismiss)*; SFM Holdings*, 600 F.3d at 1337 (district court properly considered a contract on defendant's motion to dismiss claims for breach of fiduciary duty and constructive fraud)*.

of (or deemed) interest payable hereunder exceed the maximum rate of interest allowed by applicable law." DE 27-1 ¶ 9 (C-D).

The closing disclosures addressed "Projected Payments" and an "Estimated Total Monthly Payment" of "$179.81" as follows:

| **Projected Payments** | | |
|---|---|---|
| **Payment Calculation** | | |
| Principal & Interest | | $ 179.81 |
| Mortgage Insurance | + | 0 |
| Estimated Escrow<br>*Amount can increase overtime* | + | 0 |
| **Estimated Total Monthly Payment** | | **$ 179.81** |
| **Estimated Taxes, Insurance & Assessments**<br>*Amount can increase over time*<br>*See page 4 for details* | $64.67<br>a month | This estimate includes                              In escrow?<br>☒ Property Taxes                                              NO<br>☒ Homeowner's Insurance                             NO<br>☒ Other: Maint. Fees & Addtl Charges       NO<br>*See Escrow Account on page 4 for details. You must pay for other property costs separately.* |

DE 27-3 at 2.

In the section entitled "Calculating Cash to Close," the closing disclosures described the $450 "Administrative Fee to Seller" as referenced in Section K, titled "Due from Borrower At Closing" and Section L, titled "Paid Already by or on behalf of Borrower at Closing." DE 27-3 at 4. Thus, the closing disclosures made clear that the Loan Amount did not include that Administrative Fee. DE 27-3 at 4.

The closing disclosures also included detailed "Loan Calculations," including an "Annual Percentage Rate" of 16.999%:

6

| Loan Calculations | |
|---|---|
| **Total of Payments.** Total you will have paid after you make all payments of principal, interest, mortgage insurance, and loan costs, as scheduled. | $21,578.94 |
| **Finance Charge.** The dollar amount the loan will cost you. | $11,228.94 |
| **Amount Financed.** The loan amount available after paying your upfront finance charge. | $10,350.00 |
| **Annual Percentage Rate (APR).** Your costs over the loan term expressed as a rate. This is not your interest rate. | 16.990% |
| **Total Interest Percentage (TIP).** The total amount of interest that you will pay over the loan term as a percentage of your loan amount. | 108.49% |

DE 27-3 at 6. The Total Interest Percentage was calculated for the term of the loan—

10 years. DE 27-1 ¶ 3; DE 27-3 at 2.

### 4. The "Counts" and Proposed Class

The Louises tried to assert three "counts" against Bluegreen, though the basis

for their counts and their proposed classes were and are not entirely clear.

In Count I, Plaintiffs tried to assert a claim under 10 U.S.C. § 987(c)(1) on

behalf of the following proposed class:

> **MLA Disclosure Class:** All covered borrowers, as defined under the MLA, who entered into an Owner Beneficiary Agreement with Bluegreen Vacations in substantially the same form as Exhibit A that did not contain a Military Annual Percentage Rate (MAPR) disclosure.

DE 16 ¶ 48. Plaintiffs did not include a time-period in the class definition, but the

MLA contains a two to five-year time limit to bring any claim. 10 U.S.C. § 987(E);

7

32 C.F.R. § 232.9(5).

In Count II, Plaintiffs tried to assert another claim under the same provision as Count I (10 U.S.C. § 987(c)(1) of the MLA) but on behalf of an "MLA TILA Disclosure Class," a class that the First Amended Complaint did not define.

In Count III, Plaintiffs tried to assert a claim under 10 U.S.C. § 987(e)(3) of the MLA on behalf of the "Arbitration Clause Class," a class that the First Amended Complaint also did not define.

## B. Dismissal

### 1. The Magistrate Judge's Report and Recommendation

After full briefing on Bluegreen's motion to dismiss the First Amended Complaint, on May 13, 2022, the Magistrate Judge issued a report and recommendation finding that that operative complaint must be dismissed for lack of Article III standing. DE 45.

The Magistrate Judge began by recognizing: "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." DE 45 at 7 (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021)). "At the pleading stage, the party invoking federal jurisdiction bears the burden of establishing all three of these standing elements 'by alleging facts that plausibly demonstrate each element.'" DE 45 at 8 (internal quotations from *Tsao v. Captiva*

*MVP Rest. Partners, LLC*, 986 F.3d 1332, 1337-38 (11th Cir. 2021)). "Mere conclusory statements do not suffice." DE 45 at 8 (quoting *Tsao*, 986 F.3d at 1338).

The Magistrate Judge first ruled that Plaintiffs' allegation that Defendants should have included a $450 administrative fee in calculating the disclosed interest rate failed to establish Article III standing for three separate reasons:

(1) *Rate Disclosed Accurately Calculated*: "[T]he closing disclosures [DE 27-3] memorializing the transaction between the parties reveal that the $450 administrative fee paid at closing covered title search and recording expenses. In other words, the fee does not fall within the types of fees that must be included within the MAPR…As such, the disclosed interest rate of 16.990% was the MAPR." DE 45 at 11.

(2) *All Pertinent Numbers Were Disclosed*: "Even if the MLA technically requires the MAPR to be disclosed in a different format, the [contract] nonetheless makes clear that all pertinent numbers were disclosed. Accordingly it is implausible that any technical violation by Defendants caused any concrete harm." DE 45 at 10.

(3) *No Allegations That Different Disclosure Would Have Changed Purchase Decision*: "Plaintiffs do not claim that the alleged miscalculation of the MAPR led to them having to pay anything extra or different than what they expected. Nor do they allege that proper

calculation and presentation of the MAPR or any of the (unspecified) unmade disclosures would have had any bearing on their decision to accept the contract. Although Plaintiffs contend in their response to the Motion that they were misled, their Complaint does not contain any allegations that they were misled by Defendants' bare procedural violations. At any rate, even if Plaintiffs had alleged they were misled, they have failed to explain how they were misled…." DE 45 at 9.

The Magistrate Judge then ruled that the inclusion of an arbitration provision in the OBA could not confer standing because there were no allegations that Bluegreen had sought—or would seek—to enforce the arbitration provision:

> *[Plaintiffs] do not even attempt to explain how this [arbitration] provision caused them any concrete harm. There is no allegation that Defendants have exercised, threatened to exercise, discussed, or even contemplated invoking the arbitration provision. There is no allegation that the inclusion of the arbitration provision impacted Plaintiffs' decision to accept the contract* (nor could there plausibly be), and therefore there are no allegations connecting the payments Plaintiffs have made to the existence of the arbitration provision. *In other words, they are seeking relief based on a mere technicality that has not impacted them in any way (let alone any real or material way).*

DE 45 at 11-12 (additional emphasis added).

## 2.    The District Court's Order Affirming and Adopting Report and Recommendation

On June 1, 2022, the District Court affirmed and adopted the report and recommendation. DE 52.

The District Court reviewed the First Amended Complaint and explained why

10

Plaintiffs had failed to plead any basis for Article III standing under *Spokeo* and its

progeny:

> The Court agrees with the Report's conclusion that the "bare procedural violation[s]" alleged by Plaintiffs are "divorced from any concrete harm" and are therefore insufficient to confer standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). The Court finds the Eleventh Circuit's standing jurisprudence concerning alleged violations of similar consumer protection statutes—such as the Truth in Lending Act, 15 U.S.C. § 1638 et seq, the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq, and the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq—makes clear that Plaintiffs have failed to meet their standing burden in this case under the Military Lending Act, 10 U.S.C. § 987 et seq. ("MLA"). *See, e.g., Cooper v. Atlantic Credit & Finance Inc.*, 822 F. App'x 951, 954-55 (11th Cir. 2020) (finding plaintiff did not "allege that she suffered any harm beyond the alleged [FDCPA] violations"); *Walters v. Fast AC, LLC*, 540 F. Supp. 3d 1112, 1125 (M.D. Fla. 2021) (dismissing TILA claim for lack of standing); *Stacy v. Dollar Tree Stores, Inc.*, 274 F. Supp. 3d 1355, 1362 (S.D. Fla. 2017) (dismissing claims that "assert only a 'bare procedural violation' of the FCRA").
>
> A review of Plaintiffs' pleadings highlights the lack of concrete harm. In support of Counts I and II, Plaintiffs allege they have standing "because they suffered a concrete injury in that they are obligated to pay under the terms of an agreement that is void from inception because it violated the MLA and also because they made a substantial down payment." Am. Compl. ¶ 12 [ECF No. 16]. They are "ostensibly obligated on a finance contract that failed to disclose mandatory information," *id.* ¶ 46, and "have suffered actual damages because they paid money to defendant based on an illegal contract without the benefit of the MLA disclosures." *Id.* at ¶ 47. Plaintiffs also aver that the arbitration provision injured them because it was impermissible to include the provision in the contract under the MLA. *Id.* at ¶ 98.
>
> It is well established in the Eleventh Circuit that "conclusory statement[s] that a statutory violation caused an injury is not enough [to establish standing.]" *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 928 (11th Cir. 2020) (en banc). This is because "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* (quoting *Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 957–58 (8th Cir. 2019)) (internal quotation marks omitted). *As illustrated by the allegations in the Amended Complaint, Plaintiffs fail to*

*identify any concrete harm they have experienced as a result of the statutory violations. Notably, there is no indication that the required disclosures or the inclusion of an arbitration provision—both of which constitute the alleged MLA violations—impacted Plaintiffs in any way. By merely alleging the MLA was violated without establishing any "downstream consequences," Plaintiffs lack standing to proceed. Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020).

DE 52 at 2-3.

The District Court then went on to explain why Plaintiffs' principal argument in their Objections to the Magistrate's Report and Recommendation "directly contradicts the Supreme Court's holding in *Spokeo*":

In their Objections, *Plaintiffs attempt to distinguish between the Eleventh Circuit's treatment of analogous consumer protection statutes and the MLA, claiming "it was the Congressional intent that any contract that violates any provision of the MLA is automatically void from inception." Objections at 5. This line of reasoning directly contradicts the Supreme Court's holding in Spokeo that "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." 578 U.S. at 341.*

Indeed, the Court recently reaffirmed this principle in *TransUnion LLC v. Ramirez*, explaining that Congressional authorization of suits alleging only statutory violations "would flout constitutional text, history, and precedent." 141 S. Ct. 2190, 2206 (2021). Put simply, "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Muransky*, 979 F.3d at 926 (quoting *Spokeo*, 578 U.S. at 339) (internal quotation marks omitted). Thus, the Court finds that Defendant's purported violations of the MLA do not—and cannot—automatically result in a concrete injury suffered by Plaintiffs.

DE 52 at 2-3.[3]

---

[3] The District Court then remarked in a footnote "that the Report appears to

### C. Plaintiffs' Depositions

On this appeal, Plaintiffs spend five pages of their brief quoting from their deposition transcripts, but those depositions in fact establish that Plaintiffs cannot plead facts establishing standing. At deposition, the Louises testified as follows:

1. **The Louises admitted that their reasons for the purchase had nothing to do with the financial disclosures.**

On December 19, 2020, the Louises visited a Bluegreen resort in Florida, DE 46 ¶ 5 (citing DE 46-1 at 61:8-62:24, 74:25-75:4; DE 46-2 at 50:6-10), and, on December 20, they attended a presentation about purchasing a Bluegreen timeshare, DE 46 ¶ 6 (citing DE 46-1 at 76:25-77:11; DE 46-2 at 55:2-17, 64:25-65:11). At deposition, where she used a translator, Ms. Louis testified that she can "not really" understand spoken English, testified that while at the Bluegreen resort "didn't understand what I was signing," and admitted that she relies on her husband to interpret English. DE 46 ¶ 7 (citing DE 46-2 at 19:25-20:1).

Mr. Louis testified that he felt pressured to purchase because individuals from Bluegreen said "it's a dream come true, you need to buy this, it's a good deal, blah, blah, blah." DE 46 ¶ 49 (citing DE 46-1 at 80:20-81:10). When confronted with his receipts for documents, including the OBA, Promissory Note, and closing

---

somewhat conflate concreteness and traceability." DE 52 at 3 n.1. But it noted: "Due to Plaintiffs' failure to establish concrete harm, the court finds it unnecessary to address alternative arguments related to traceability." DE 52 at 3 n.1.

disclosures, Mr. Louis testified: "I receive all of this paper." DE 46 ¶ 46 (citing DE 46-1 at 87:5-23). Mr. Louis also testified that, on December 20, "I wasn't reading papers." DE 46 ¶ 47 (citing DE 46-1 at 64:19-24). In the ten calendar days for rescission following his purchase, Mr. Louis testified: "I was going to my friend wedding, so I did not have time to go over the packet to read everything." DE 46 ¶ 48 (citing DE 46-1 at 61:3-62:11).[4]

### 2. The Louises admitted that any additional financial disclosures would not have made a difference.

At deposition, Mr. Louis testified he did not recall paying more than the estimated monthly payment in the closing disclosures, DE 46 ¶ 27 (citing DE 46-1 at 66:24-67:9), and he did not know if the MLA required different disclosures in the box titled "Loan Calculations," DE 46 ¶ 27 (citing DE 46-1 at 70:3-7).

Mr. Louis initially testified the Military Lending Act means that if a "person is a soldier, they use that Military Lending Act to make sure is covered by the act

---

[4] The Louises testified that their reasons for the purchase had nothing to do with financial disclosures or any lack of financial disclosure. Mr. Louis testified that individuals from Bluegreen said "if I left, whatever benefit they are giving me that day, I could not get it back anymore," DE 46 ¶ 49 (citing DE 46-1 at 82:14-24). At deposition, Mr. Louis also testified that he felt as if he were being held "hostage," DE 46 ¶ 50 (citing DE 46-1 at 73:10-16, 74:2-15), but admitted that no one from Bluegreen said anything bad would happen to him if he left the presentation, DE 46 ¶ 50 (citing DE 46-1 at 80:1-14, 82:14-20, 85:11-18). Ms. Louis admitted that during their stay at the Bluegreen resort she was not "ever a hostage," DE 46 ¶ 51 (citing DE 46-2 at 76:11-13), and testified that "[t]he only reason I think I am victim of Bluegreen [is] because they pressure us to purchase something that wasn't good for us," DE 46 ¶ 51 (citing DE 46-2 at 33:16 – 34:17).

and do not get loan or money that they cannot pay back." DE 46 ¶ 39 (citing DE 46-1 at 31:6-14). But Mr. Louis admitted that he does not know if the MLA makes sure soldiers only get loans that they can pay back, DE 46 ¶ 40 (citing DE 46-1 at 31:16-19), does not know if the MLA has a cap on interest, DE 46 ¶ 40 (citing DE 46-1 at 31:21-24), and he does not know if the MLA prohibited Bluegreen from selling a timeshare to him, DE 46 ¶ 40 (citing DE 46-1 at 33:12-20).

Mr. Louis also testified that he did not know what disclosures the MLA requires, DE 46 ¶ 41 (citing DE 46-1 at 32:5-22), did not know what disclosures the MLA required Bluegreen to make, DE 46 ¶ 41 (citing DE 46-1 at 32:25-33:4), and did not know if the MLA required Bluegreen to make any disclosures different from the disclosures he received, DE 46 ¶ 41 (citing DE 46-1 at 58:5-9).

Mr. Louis also admitted he did not understand many of the terms central to understanding any additional MLA disclosures. DE 46 ¶ 42 (citing DE 46-1 at 25:10–38:11). Mr. Louis admitted that he does not know how his interest rate here was calculated, DE 46 ¶ 43 (citing DE 46-1 at 52:7-9), how an Annual Percentage Rate or APR is calculated, DE 46 ¶ 43 (citing DE 46-1 at 24:15-22), or how a Military Annual Percentage Rate or MAPR would be calculated, DE 46 ¶ 43 (citing DE 46-1 at 30:20-23; 38:8-11).

As explained above, pp. 5-7, the written disclosures signed by the Louises plainly disclosed that the administrative fee of $450 was part of the deposit and not

secured by any loan. Mr. Louis also admitted that he did not know how the administrative fee was calculated, DE 46 ¶ 45 (citing DE 46-1 at 46:22-24), did not know if any part of the loan went to that fee, DE 46 ¶ 45 (citing DE 46-1 at 47:5-7), and did not know if the deposit included that fee, DE 46 ¶ 45 (citing DE 46-1 at 49:7-10).

## SUMMARY OF THE ARGUMENT

The Military Lending Act has laudable purposes, but this lawsuit did nothing to advance those purposes and the Magistrate Judge and District Court correctly ruled that exercising jurisdiction here would have violated Article III of the United States Constitution.

The Military Lending Act, enacted by Congress in 2006 and implemented by the Department of Defense, governs extensions of "consumer credit" to qualifying members of the armed forces and principally (1) prohibits loans with annual interest rates of higher than 36% percent and (2) mandates financial disclosures.

Plaintiffs here have only alleged a single disclosure failure—the failure to include a $450 administrative fee as a financed charge and disclose an MAPR that was 1.107% higher than the APR disclosed. But Plaintiffs do not and cannot challenge the Magistrate Judge's findings that: (1) the closing disclosures revealed the "$450 administrative fee [was] paid at closing" and "does not fall within the types of fees that must be included within the MAPR," DE 45 at 11; (2) even if the

numbers were disclosed in a different format "all pertinent numbers were disclosed," DE 45 at 11; and (3) Plaintiffs "do not claim that the alleged miscalculation of the MAPR led to them having to pay anything extra or different" or "had any bearing on their decision to accept the contract, DE 45 at 9. For each of these independent reasons, Plaintiffs failed to make any factual allegations that any disclosure failures had any impact on them.

That left Plaintiffs with only conclusory allegations about the violations of the MLA, which do not satisfy any pleading standard, let alone satisfy their burden to plead facts establishing standing. About all of this, Plaintiffs and amici say nothing.

Of course, because the MLA did not require any additional disclosures here, then this lawsuit does not advance its purposes. Unlike the predatory loans targeted by the Military Lending Act, such as payday loans, the loan here fell well below the statute's interest rate cap; also unlike those loans, the loan here was accompanied by voluminous disclosure. Indeed, the disclosure here was so voluminous and comprehensive that Plaintiffs could identify no harm caused to them by failing to receive any information. The Magistrate Judge and District Court both correctly concluded those deficiencies were fatal under Article III of the United States Constitution.

And, "[t]he law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers

of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Trichell v. Midland Credit Mgmt.*, 964 F.3d 990 (11th Cir. 2020). The Magistrate Judge and District Court here both preserved that fundamental principle, and this Court should affirm.

## ARGUMENT

### I.    The District Court and Magistrate Judge Correctly Concluded that Plaintiffs Lacked Article III Standing

"Some preliminaries: As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021). The "irreducible constitutional minimum" to establish Article III standing requires "[t]he plaintiff []have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

### A.    No Injury-in-Fact

The Magistrate Judge and District Court correctly ruled that the First Amended Complaint failed to plausibly plead any injury-in-fact. *See* pp. 8-12, above.

"[T]he requirement of injury in fact is a hard floor of Article III jurisdiction

that cannot be removed by statute." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). A plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right," because "Article III standing requires a *concrete* injury even in the context of a statutory violation," which "must be '*de facto*'; that is, it must actually exist." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548-49 (2016). Under Article III, "an injury in law is not an injury in fact." *Transunion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021). Only those plaintiffs who have been "concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.*

### 1. On its face, the First Amended Complaint fails to plead any injury-in-fact.

"At the pleading stage, the party invoking federal jurisdiction bears the burden of establishing all three of these standing elements 'by alleging facts that "plausibly" demonstrate each element.'" DE 45 at 8 (quoting *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1337-1338 (11th Cir. 2021) and citing *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 917, 924-925 (11th Cir. 2020)). "Even at the pleading stage, the 'litigant must clearly and specifically set forth facts' to satisfy the requirements of Article III." DE 45 at 8 (quoting *Muransky v. Godiva Chocalitier, Inc.*, 979 F.3d 917, 924-925 (11th Cir. 2020) (en banc)). "Mere conclusory statements do not suffice." DE 45 at 8 (citing *Tsao*, 986 F.3d at 1338).

19

The Louises have asserted that Bluegreen failed to disclose mandatory information required by the Military Lending Act, but do not identify what information was not disclosed, how it should have been disclosed, or how the supposed nondisclosure injured them. Though they admitted Bluegreen made disclosures consistent with the Truth in Lending Act, DE 16 ¶ 80, the Louises asserted that the Military Lending Act required "written and oral disclosures that are different from TILA," DE 16 ¶ 7, again without identifying what those differences are or how those supposed differences injured them.

The closest the First Amended Complaint comes is the allegation that the administrative fee was a "credit-related cost" that should have been included in an MAPR that "was 1.107% higher" than the APR disclosed. *See* p. 4, above. But elsewhere the First Amended Complaint concedes that the MAPR need not be disclosed as a "numerical value or dollar amount" as long as it "describe[s] any charges you may impose, consistent with the MLA and terms of the agreement, to calculate the MAPR." DE 16 ¶ 21. And the OBA attached to the First Amended Complaint disclosed "PURCHASE TERMS" that included an "Administrative Fee" of "$450." DE 16 at 28. The First Amended Complaint certainly failed to grapple with whether any alleged disclosure differences in form—not substance—created any sort of concrete harm. They did not.

The First Amended Complaint attacked the OBA's inclusion of an arbitration

20

provision and alleged that the MLA prohibited Bluegreen from requiring arbitration here, DE 16 ¶ 101, but the Louises did not and could not allege that Bluegreen has ever sought to enforce that right. Bluegreen has never filed a motion to compel arbitration; the Louises litigated (and lost) in the District Court; and they continue to litigate in this Court.

As for any future potential lawsuit, perhaps on a different legal theory or in state court, that is speculative at best and certainly insufficient to establish standing. This Court has "held many times that a plaintiff failed to establish an injury in fact when the likelihood of future constitutional injury was too speculative." *Corbett v. TSA*, 930 F.3d 1225, 1233 (11th Cir. 2019). "The Supreme Court has [also] long indicated that standing predicated on a risk of harm must be based on something more than a minor or theoretical risk—a substantial risk that the harm will occur, for example." *Muransky v. Godiva Chocolate*, 979 F.3d 917, 927 (11th Cir. 2020) (en banc). The Louises did not assert any other claims in this lawsuit; have not identified any other potential claims; and have no basis for speculating that, if they asserted any claims, Bluegreen would seek to enforce the arbitration provision. It would not.

In *Bowen v. First Family Financial Services, Inc.*, 233 F.3d 1331, 1339-1340 (11th Cir. 2000), this Court held that plaintiffs in a proposed Truth in Lending Act class action lacked standing to challenge an arbitration agreement because there were no allegations it would be enforced. This Court held there that merely signing

21

an agreement containing an arbitration provision did not confer standing because "[t]here is at most a perhaps or maybe chance that the arbitration agreement will be enforced against these plaintiffs in the future, and that is not enough to give them standing to challenge its enforceability." *Id.* at 1341. "Whether viewed as a problem of standing or ripeness, the result in this case is that, at this point, the speculative possibility that the arbitration agreement may be enforced against the plaintiffs is too uncertain to present a constitutional case or controversy with respect to the enforceability of that agreement." *Id.* at 1341 n.7. So too here.

### 2. The Promissory Note and closing disclosures incorporated by reference foreclose any allegations of an injury-in-fact.

As explained above, p. 5, neither Plaintiffs nor amici challenge the Magistrate Judge's consideration of the Promissory Note and closing disclosures incorporated into the First Amended Complaint by reference. Indeed, as the Magistrate Judge explained, the First Amended Complaint affirmatively alleged: "All of the documents that are referenced in the Agreement inform the nature of the transaction and no single document reveals the entirety of the rights, obligations and restrictions attendant to the transaction." DE 45 at 6 (quoting DE 16 ¶ 38). The Magistrate Judge further reasoned that Plaintiffs "seek[] to rescind the very documents attached to the Motion," which "go to the heart of the Complaint," "are central to Plaintiffs' claims," and "their authenticity is not disputed." DE 45 at 7.

The OBA, on its face, informed the Louises that it was disclosing an "Annual

Percentage Rate," not an "MAPR." *See* DE 27-1 at ¶¶ 2, 6. In response, the Louises allege a difference between their APR and MAPR of 1.107%, but the incorporated documents and the governing regulations foreclose those allegations.

The MAPR calculation included in the First Amended Complaint is based on the allegation that "the identifiable credit-related cost Bluegreen financed was an Administrative Fee ($450.00)," which is directly contradicted by their citation to the attached document. DE 16 ¶ 77 (citing DE 16, Ex. A). The $450 Administrative Fee was neither financed nor a "credit-related cost"—it was a closing cost paid at purchase to cover Bluegreen's expenses relating to recording fees and title searches for the underlying real estate. *See* DE 16 at 28; DE 27-3 at 2-3.[5]

Under 32 C.F.R. § 232.4, this $450 Administrative Fee is not an input into the MAPR calculation, which means that the correct MAPR and the disclosed APR are identical—16.990%. The Louises conceded: the MAPR calculation includes: "1) any credit insurance premium or fee, any charge for single premium credit insurance, any fee for a debt cancellation contract, or any fee for a debt suspension agreement and 2) any fee for a credit-related ancillary product sold in connection with the credit transaction for closed-end credit or an account for open-end credit

---

[5] "Where there is a conflict between allegations in a pleading and exhibits thereto, it is well-settled that the exhibits control." *Friedman v. Market Street Mortg. Corp.*, 520 F.3d 1289 n.6 (11th Cir. 2008); *see also*, *Comparelli v. Republica Bolivariana De Venezuela*, 891 F.3d 1311 n.1 (11th Cir. 2018) (same).

pursuant to 32 C.F.R. § 232.4." DE 16 ¶ 67. As explained above, the $450 Administrative Fee was included in the down payment and is not a fee charged for credit insurance, debt cancellation, debt suspension, or for a credit-related ancillary product—it covered the closing costs related to the recordation fees and title search for the underlying real estate conveyance. DE 27-3 at 2-3; *see also* pp. 5-7, above. Thus, the Louises could not possibly suffer any injury from any failure to disclose the MAPR, because the correct MAPR and the disclosed APR are identical.

The Louises also did not allege that these alleged nondisclosures had any effect on their decision to finance their timeshare purchase or their decision to purchase. They did not and could not spell out why such a small difference would have mattered in the context of an $11,500 purchase, let alone how it could cause an injury-in-fact cognizable at common law. In other words, the First Amended Complaint offered nothing more than "conclusory statement[s] that a statutory violation caused an injury." *Muransky*, 979 F.3d at 928.

### 3. Plaintiffs' depositions confirmed that they have not suffered an injury-in-fact.

"While [this Court] typically confine[s] [its] standing analysis to the four corners of the complaint, [it] may look beyond it when [it] has facts in the record." *Corbett*, 930 F.3d at 1235.

As explained above, pp. 13-16, at deposition, the Louises admitted that their reasons for the purchase had nothing to do with the financial disclosures. Ms. Louis

relies on her husband to translate English, and Mr. Louis testified that, though he received all of the disclosures, on December 20, "I wasn't reading papers." DE 46 ¶ 47 (citing DE 46-1 at 64:19-24). In the ten calendar days for rescission following his purchase, Mr. Louis testified: "I was going to my friend wedding, so I did not have time to go over the packet to read everything." DE 46 ¶ 48 (citing DE 46-1 at 61:3-62:11). Mr. Louis also testified that he did not know what additional disclosures the MLA might require, and did not understand how an MAPR would be calculated.

As explained above, pp. 5-7, the written disclosures signed by the Louises plainly disclosed that the administrative fee of $450 was part of the deposit and not secured by any loan. Mr. Louis also admitted that he did not know how the administrative fee was calculated, DE 46 ¶ 45 (citing DE 46-1 at 46:22-24), did not know if any part of the loan went to that fee, DE 46 ¶ 45 (citing DE 46-1 at 47:5-7), and did not know if the deposit included that fee, DE 46 ¶ 45 (citing DE 46-1 at 49:7-10). In short, the Louises' depositions foreclose any claim of an injury-in-fact.

### 4. Following *Spokeo*, this Court has repeatedly ruled Plaintiffs who allege procedural violations "divorced from any concrete harm" under similar consumer protection statutes lack standing.

The Supreme Court and this Court have repeatedly ruled that *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548-49 (2016) requires finding plaintiffs who identify procedural violations of consumer protection statutes, "divorced from any concrete harm" have failed to establish any injury-in-fact.

25

In *Muransky v. Godiva Chocalatier, Inc.*, 979 F.3d 917 (11th Cir. 2020) (en banc), this Court held that a plaintiff lacked standing to bring a claim under the Fair and Accurate Credit Transactions Act based on the allegation that the defendant had printed too many digits on his credit card receipt. This Court began by describing *Spokeo* as answering "a standing question that had bedeviled litigants, scholars, and lower courts," namely whether "pleading a statutory requirement was violated is enough to establish standing," with "a resounding no." *Muransky*, 979 F.3d at 920. This Court made plain that *Spokeo* held: "a party does not have standing to sue when it pleads only the bare violation of a statute." *Muransky*, 979 F.3d at 920. Applying those principles, this Court held the plaintiff's arguments that he was entitled to a "properly truncated receipt," *Muransky*, 979 F.3d at 929, he spent time "safeguarding his receipt," *Muransky*, 979 F.3d at 930, and suffered from a "breach of confidence," *Muransky*, 979 F.3d at 931, failed to qualify as cognizable "direct harm," *Muransky*, 979 F.3d at 932.

In *Trichell v. Midland Credit Management, Inc.*, 964 F.3d 990 (11th Cir. 2020), this Court held that plaintiffs lacked standing where they alleged that they had received debt-collection letters that were misleading under the Fair Debt Collection Practices Act but failed to allege that they were misled. This Court reasoned: (1) "the complaints here do not allege that the collection letters caused [plaintiffs] any tangible injury," *id.* at 997; (2) "[t]o determine whether an intangible

26

injury is sufficiently concrete, we must look to both the history and judgment of Congress," *id.* at 997; and (3) "the common law furnishes no analog to the FDCPA claims asserted here," *id.* at 998. This Court also ruled that an abstract right to information that plaintiffs fail to tie to "consequential harms from the failure to disclose the contested information" cannot create an injury-in-fact. *Trichell*, 964 F.3d at 1004.

In *TransUnion v. Ramirez*, 141 S. Ct. 2190 (2021), the Supreme Court held that, in a case brought under the Fair Credit Reporting Act, the provision of misleading credit reports to third-party businesses created an injury-in-fact but misleading internal credit files not reported to third parties did not. As for the latter, the Court explained that "[t]he plaintiffs did not allege that they failed to receive any required information, and argued only that they received it in the wrong format." The Supreme Court also cited this Court's decision in *Trichell* with approval and reasoned: "the plaintiffs have identified no downstream consequences from failing to receive the required information." *TransUnion*, 141 S. Ct. at 2214.[6]

---

[6] *See also*, *Cooper v. Atlantic Credit & Finance Inc.*, 822 F. App'x. 951, 954-55 (11th Cir. 2020) (finding alleged FDCPA violations "just as inchoate, if not more so" than in *Trichell* because the plaintiff did not "allege that she suffered any harm beyond the alleged statutory violations").

District Courts in this Circuit have also repeatedly found no injury-in-fact where a plaintiff alleges only bare procedural or technical violations of similar consumer protection statutes. *See, e.g., Preisler v. Eastpoint Recovery Group, Inc.*, 2021 WL 2110794 (S.D. Fla. May 25, 2021) (dismissing FDCPA claim, finding Plaintiff did not sustain a concrete and particularized injury relying, in part, on *Cooper* and

These opinions apply with even greater force to require dismissal here. The Louises did not identify any nondisclosures, let alone explain how any nondisclosure caused any concrete harm. And the Magistrate Judge and District Court correctly concluded, pp. 8-12, above, that the conclusory assertions of concrete harm were foreclosed by the First Amended Complaint itself, the attached OBA, and the incorporated Promissory Note and closing disclosures.

### 5. Appellants' and Amici's arguments about the benefit of the bargain are contrary to governing law.

*Spokeo* was a sea change in standing jurisprudence, as this Court has recognized. But Plaintiffs and amici nonetheless try to rely on a series of arguments and authorities that ignore the governing pleadings, incorporated documents, and governing precedent.

Plaintiffs argue that "paying money you don't owe" "is the epitome of concrete harm," but rely only on conclusory assertions the MLA was violated to show the money was not owed. Opening Br. at 22. Such "conclusory statements []

---

*Trichell,* and noting, that "the Eleventh Circuit does not recognize an anything-hurts-so-long-as-Congress-says-it-hurts theory of Article III injury"); *Hill v. Resurgent Capital Services, L.P.*, 2020 WL 4429254 (S.D. Fla. July 31, 2020) (same); *Walters v. Fast AC, LLC*, 2021 WL 1924180 (M.D. Fla. May 13, 2021) (dismissing TILA claim); *Stacy v. Dollar Tree Stores, Inc.*, 274 F.Supp.3d 1355 (S.D. Fla. 2017) (dismissing FCRA claim, finding that a violation of the FCRA's stand-alone document disclosure does not automatically cause a concrete injury for purposes of Article III standing); *Jones v. The Salvation Army*, 2019 WL 6051437 (M.D. Fla. Nov. 15, 2019) (same).

do not suffice" and "plaintif[s] must set forth general factual allegations that plausibly and clearly allege a concrete injury." *Tsau v. Captiva MVP Restaurant Partners, LLC*, 986 F.3d 1332, 1338 (11th Cir. 2021) Plaintiffs here cannot identify a single disclosure deficiency, let alone how that disclosure deficiency—in light of Bluegreen's voluminous disclosures—cost them a penny.

Plaintiffs try to rely on *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1084-1085 (11th Cir. 2019), but this Court held that plaintiffs there had suffered a concrete injury where "[t]hey paid money to purchase [] supplements and in return received adulterated supplements that could not lawfully be sold and thus were worthless." Since, this Court has ruled that a plaintiff failed to allege an injury-in-fact where she alleged General Mills failed to disclose that Cheerios contain glyphosate. *Doss v. General Mills, Inc.*, 816 F. App'x. 312, 312-313 (11th Cir. 2020). This Court ruled there that—unlike in *Debernardis*—the plaintiff did not allege the Cheerios she purchased contained "any glyphosate, much less a level of glyphosate that is so harmful the Cheerios are presumptively unsafe and therefore worthless." *Id.* at 314. So all plaintiff was left with were allegations of "merely a conjectural or hypothetical injury," requiring dismissal. *Id.*[7]

_____

[7] Plaintiffs' and amici's other pre-*Muransky* and pre-*Transunion* cases on economic harm are inapposite. *See*, *e.g.*, *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("The Bankruptcy Court's approval of the structured dismissal cost petitioners something. They lost a chance to obtain a settlement that respected their priority. Or, if not that, they lost the power to bring their own lawsuit on a claim that

### 6. Appellants' and Amici's arguments about void contracts are contrary to governing law.

Plaintiffs' argument that the MLA's provision making certain contracts "void" creates standing, Opening Br. at 19-25, is contrary to *Spokeo*.

In *United States v. Mortgage Investors Corporation*, 987 F.3d 1340 (11th Cir. 2021), this Court rejected the argument that Georgia's Uniform Voidable Transfers Act can confer jurisdiction absent a concrete injury. In that case, relators under the False Claims Act argued that they had standing as "creditors" because the Georgia statute "gives creditors the right to avoid fraudulent transfers." *Id.* at 1357. But this Court held that "legislatures cannot simply create an injury in fact where there is no concrete injury," that "the Georgia legislature could give relators the right to pursue a fraudulent transfer claim only if relators have a concrete interest in a claim," and "it would be inconsistent with *Spokeo* to hold that the UVTA can create a concrete injury where none existed." *Id.* at 1348. So too with the Military Lending Act.[8]

---

had a settlement value of $3.7 million."); *MSPA Claims 1 v. Tenet Florida*, 918 F.3d 1312, 1318 (11th Cir. 2019) (finding injury-in-fact based on "not just [] entitlement to reimbursement of the appropriate amount but also [] entitlement to receive that reimbursement on time," rather than "seven months late"); *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 292-293 (3d Cir. 2005) (ruling franchise car dealers asserting that Ford certification processes "constituted nine violations of federal and state law" pleaded injuries-in-fact based on detailed allegations showing the certification process resulted in "forced expenditures of money and loss of control").

[8] In another post-*Spokeo* case, the Fifth Circuit similarly ruled that plaintiffs seeking to void a contract under state law lacked standing where the defendant gym "gave Plaintiffs exactly what they paid for: access to a gym." *Wendt v. 24 Hour Fitness*

Plaintiffs try to rely on *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246 (11th Cir. 2003), but their interpretation of that case conflicts with this Court's and the Supreme Court's law since *Spokeo*. In that case, a plaintiff sued lenders alleging they had "violated Florida laws regulating insurance" "by procuring insurance contracts without making the required disclosures and without first having the application forms approved by the Florida Department of Insurance." *London*, 340 F.3d at 1248. Despite the plaintiff's admission that he did not read the disclosures and that those disclosures would not have affected his purchase decision, *id.* at 1251, "Florida courts recognize paying consideration for an illegal contract [is] an injury per se," *id.* at 1151-1152. This Court held that, given the undisputed violations of the Florida statutes and governing Florida common law, plaintiff "asserts the invasion of an interest legally protected by Florida's common law of contracts and thereby obtains standing." *London*, 340 F.3d at 1252.

In *London*, there were conceded statutory violations, including disclosure violations, but here neither Plaintiffs nor amici can identify any disclosures required by the Military Lending Act that Bluegreen failed to make. And, if this Court were to extend *London* to create standing here, that interpretation would be contrary to the Supreme Court's later ruling in *Spokeo* that a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory

---

*USA*, 821 F.3d 547, 550 (5th Cir. 2016).

right and purports to authorize the person to vindicate the right." *Muranksy*, 979 F.3d at 923.[9]

### B.    No Causation or Redressability

Under Article III, the Louises also have to meet the causation requirement. "[P]laintiffs must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976). A plaintiff must show "a causal connection between the alleged injury and the allegedly improper conduct." *Florida Ass'n of Medical Equipment Dealers v. Apfel*, 194 F.3d 1227, 1230 (11th Cir. 1999). In short, the plaintiff must show an injury caused by a "failure to comply with" the law. *Cordoba v. DIRECTV*, 942 F.3d 1259, 1264, 1272 (11th Cir. 2019).

Plaintiffs argue "a plaintiff need only allege harm that is traceable to the defendant, not the provision of law the defendant allegedly violated," Opening Br. at 26, but the most recent Supreme Court case they cite defeats that argument. In

---

[9] Plaintiffs' and amici's other pre-*Muransky* and pre-*Transunion* cases are inapposite. *See, e.g., Dubuisson v. Stonebridge Life Insurance Co.*, 887 F.3d 567, 575 (2d Cir. 2018) (claims sounding in fraud "allege[d] that defendants misrepresented the nature of the [insurance] policies by failing to disclose that they were not issued in compliance with New York law and in so doing, induced plaintiffs to purchase the policies at an inflated price"); *Graham v. Catamaran Health Solutions LLC*, 940 F.3d 401, 408 (8th Cir. 2017) (plaintiff "allege[d] the overwhelming majority of money he paid for premiums did not pay for insurance").

*Collins v. Yellen*, 141 S. Ct. 1761 (2021), the Supreme Court ruled: "for purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to the *allegedly unlawful conduct of the defendant*, not the provision of law that is challenged." In that case, shareholders challenged as unlawful the adoption and implementation of an agency decision in the wake of the failures of Fannie Mae and Freddie Mac, "which is responsible for the variable dividend formula that swept the companies' net worth to Treasury and left nothing for the private shareholders." *Collins*, 141 S.Ct. at 1779. Here, by contrast, neither the Louises nor amici identify any unlawful act by Bluegreen that caused them any concrete harm.[10]

---

[10] None of the Louises' or amici's other cases support the proposition that causation requires only some connection—however tangential—to the defendant. *See, e.g., Duke Power Company v. Carolina Environmental Study Group*, 438 U.S. 59 (1978) (ruling that if plaintiffs were successful in invalidating Price-Anderson Act, then district court's factual findings after evidentiary hearing established "substantial likelihood that the [] nuclear plants would neither be completed nor operated" "in major part on the testimony of corporate officials before the Joint Committee on Atomic Energy"); *Wilding v. DNC Services Corp.*, 941 F.3d 1116, 1126 (11th Cir. 2021) (finding donor plaintiffs had standing where they "alleged that they made direct donations to the DNC after some of the purportedly false statements were made and before the hacked documents were published. And they expressly alleged that they relied on the false statements to their detriment."); *Taylor v. Polhill*, 964 F.3d 975, 981 (11th Cir. 2020) ("Because [plaintiff] Taylor could not be fined were the Pre-Sale Testing Statute invalidated, Taylor has satisfied the causation requirement"); *Moody v. Holman*, 887 F.3d 1281, 1286-1287 (11th Cir. 2018) (plaintiff alleged "Alabama's refusal to return him to the custody of the United States in accordance with federal law is what will cause his execution"); *Chiles v. Thornburgh*, 865 F.2d 1197 (11th Cir. 1989) (ruling Miami-Dade County suffered injury from allegedly unlawful operation of federal detention facility that led to riots, escapes, and economic injury that "was caused by the inadequate operation of" the facility and "it is reasonable to assume that the injury will be redressed by a favorable

As explained above, pp. 22-24, the Louises alleged no facts showing how any alleged nondisclosures had any meaningful effect on their decision to finance their timeshare purchase or their decision to purchase. In other words, the Louises alleged no facts connecting any illegal action by Bluegreen to any injury, and thus also failed to allege any facts showing traceability.

Last week, in *Walters v. Fast AC, LLC*, __ F. 4th __, 2023 WL 1771643 (11th Cir. 2023), this Court ruled that a plaintiff borrower who did not read disclosures could not establish standing to bring a Truth in Lending Act claim. The borrower there sued because he purchased air conditioning repairs financed by a loan and testified at deposition that the salesperson "lied about the price of [the] loan," "prevented [the borrower] from viewing FTL's loan paperwork," failed to provide TILA disclosures, and "had he received the proper disclosures, he would not have accepted the loan." *Id.* at *1. This Court ruled the plaintiff had pleaded a basis for causation under the theory the salesperson was defendant's agent and had prevented him from seeing the paperwork, *id.* at *7, but rejected the plaintiff's theory of

---

judicial decision enjoining the executive facilities from placing felons" in that facility "and/or from allowing overcrowding" there); *Wildearth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013) ("the local pollution that causes [appellants'] members' aesthetic and recreational injuries follows inexorably from the decision to authorize leasing on the West Antelope II tracts"); *Desert Citizens against Pollution v. Bisson*, 231 F.3d 1172, 1178 (9th Cir. 2000) ("Desert Citizens asked the district court to set aside an illegal exchange that would injure its members" and their "continued use and enjoy[ment] [of] the selected federal lands")

causation offered at summary judgment. This Court held the "alleged omission of the correct TILA disclosures in its loan paperwork could not have been a factual cause of [plaintiff's] decision to take out the loan because [the] employee prevented him from ever seeing that paperwork," *id.* at *6. It held that the borrower and plaintiff there "cannot trace his injuries to the text of those disclosures." *Id.*

The reasoning of *Walters* applies with far greater force to require dismissal here. As explained above, pp. 5-8, not only did the Louises never read the voluminous disclosures, they never identified how the MLA required materially different disclosures, they never alleged that different disclosures would have changed their purchase decision, and any such allegations were foreclosed by their deposition testimony.

## II.    Plaintiffs' Failure to State a Claim Provides Additional Grounds for Dismissal

Although the Magistrate Judge and the District Court correctly ruled that the Louises lacked Article III standing, this Court "may affirm on any ground supported by the record, regardless of whether that ground was relied upon or even considered below." *Aaron Private Clinic Management LLC v. Berry*, 912 F.3d 1330, 1335 (11th Cir. 2019). This Court has accepted as an "alternative basis for affirmance," "Rule 12(b)(6) arguments that the claims in the complaint were substantively insufficient." *Wilding v. DNC Services Corporation*, 941 F.3d 1116 (11th Cir. 2019). This Court can affirm on that basis here too.

## A.    The Statute Exempts Transactions Involving Residential Mortgages

The plain language of the Military Lending Act exempts the financing here, meaning the Louises did not and could not state a claim under the statute.

The Military Lending Act and its implementing regulations define the term "consumer credit" as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is: (i) subject to a finance charge or (ii) payable by a written agreement in more than four installments." 32 C.F.R. § 232.3(f)(1)(i)-(ii). This definition does not extend to *"[a] residential mortgage, which is any credit transaction secured by an interest in a dwelling, including a transaction to finance the purchase* or initial construction of *the dwelling*, any refinance transaction, home equity loan or line of credit, or reverse mortgage." 32 C.F.R. § 232.3(f)(2)(i).

The Military Lending Act's implementing regulations expressly define the term "dwelling" to include "individual condominium unit[s]":

> *Dwelling*  means a residential structure that contains one to four units, whether or not the structure is attached to real property. The term *includes an individual condominium unit*, cooperative unit, mobile home, and manufactured home.

32 C.F.R. § 232.3(k).

Here, the Louises purchased a timeshare interest in a specific condominium unit at the Resort at World Golf Village in St. Augustine, Florida: Condominium

36

Unit 214 / Vacation Week No. 13O. DE 16 at 27. Because the Plaintiffs financed their purchase, they encumbered their timeshare interest with a mortgage. *See* DE 27-2. Indeed, the Louises' Promissory Note provides that their "performance under this Note is secured by a mortgage, deed of trust, or other security instrument of even date relating to the Unit(s) and Vacation Week(s) described therein (the 'Property') and given to the Note Holder or its designee." DE 27-1 ¶ 7. In other words, the Louises secured a mortgage to purchase their deeded condominium unit at the Resort at World Golf Village Condominium. In the Amended Complaint, the Louises make the bald legal conclusion that "the timeshare vacation service or product that was the subject of [the Louises'] transaction is not a residential mortgage and therefore not exempt from the MLA." DE 16 ¶ 20. But that assertion cannot be reconciled with the plain language of the Military Lending Act.

The Louises have tried to paint their timeshare purchase as a transaction not involving the conveyance of real property, but as "more akin to an installment agreement allowing the purchaser the potential to rent vacation properties" by referencing Bluegreen's marketing materials. DE 16 ¶¶ 3, 27. The Louises went as far as to allege that it's merely "cloaked in the disguise of a timeshare interest at a particular resort." DE 16 ¶ 3. While Bluegreen's marketing focuses on the vacations individual owners can enjoy through membership in the Vacation Club, this does not transform their underlying timeshare purchase into one not involving the conveyance

of real property. And, if the Louises' characterization were correct, they would simply walk themselves into the Military Lending Act's exclusion for a loan secured by "personal property."[11]

### B. Legislative History Supports Exempting Timeshare Financing from the Definition of "Consumer Credit"

Senator John Talent, the original sponsor of the Military Lending Act, was concerned with predatory payday lending because payday lenders were targeting military bases and charging "about 11 1/2 to 12 times what credit cards typically charge" or "a triple digit [annual] interest rate":

"Mr. TALENT:

Mr. President… I do want to take a few minutes to talk about an amendment which I cosponsored with Senator Nelson of Florida that passed the Senate in the Defense bill and that addresses a problem which has been growing and which is affecting the readiness of our Armed Forces.

The fact is, predatory payday lenders are targeting American troops and are trying to make a buck off of their service to our country. We rely on the military to protect us, and we have just taken a significant step to protect them from predatory lenders. *The Nelson-Talent amendment limits the annual percentage rate that payday lenders can charge soldiers and their spouses to 36 percent* or about 11 1/2 to 12 times what credit cards typically charge. I recognize that

---

[11] The Military Lending Act also exempts from the definition of "consumer credit" "a loan procured in the course of purchasing a car or other personal property, when that loan is offered for the express purpose of financing the purchase and is secured by the car or personal property procured." 10 U.S.C. § 987(i)(6)(B). The implementing regulations likewise exclude: "Any credit transaction that is expressly intended to finance the purchase of personal property when the credit is secured by the property being purchased." 32 C.F.R. § 232.3(f)(2)(iii).

payday lending can be a risky business, but a triple-digit interest rate, which is commonly charged today, is simply too much.

> *Some estimate that the average APR on a payday loan today is over 400 percent, and there have been reports of payday loans with more than 800 percent interest rates.* This is a national problem. Predatory payday lenders set up shop near our military bases throughout the country and prey on our servicemen…."

152 Cong. Rec. S6405-01, S6406; *see also* 152 Cong. Rec. H7976-02.

When Congress first enacted the Military Lending Act in 2006, it included the residential mortgage exception. *See* Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 72 FR 18157-01. The Military Lending Act then tasked the Department of Defense with defining "consumer credit" in unity with Congress's intent and its fixed exemptions. *See id*. To define consumer credit, the Department of Defense reviewed various financial surveys, all of which concluded predatory lending included (1) abusive collections actions, (2) balloon payments with unrealistic payment terms, (3) equity stripping, and (4) excessive interest rates. *See id*. Payday loans, vehicle title loans, and refund anticipation loans were considered the most predatory. *See id*. Timeshare lending was not mentioned.

The Department of Defense decided that Congress intended the Military Lending Act to apply narrowly to specific, demarcated predatory transactions. By including the residential mortgage exception, among others, Congress clearly intended to limit the Military Lending Act to "credit practices evaluated as negative *without impeding the availability of credit that is benign or beneficial to Service*

*members and their families*." *See id.* (emphasis added). Accordingly, the Department of Defense defined consumer credit as applying to only the most predatory practices identified by Congress—payday loans, vehicle title loans, and refund anticipation loans.

> "It [was] clearly the intent of the statute that consumer credit be defined by the Department, as long as it does not include the two listed exemptions [including residential mortgages]. The definition in this proposed regulation clearly excludes these two types of loans and focuses on three problematic credit products that the Department identified in its August 2006 Report to Congress on the Impact of Predatory Lending Practices on Members of the Armed Forces and Their Dependents: payday loans, vehicle title loans, and refund anticipation loans."

*See id.*

Over the next six years, payday lenders began structuring their loans to avoid the Military Lending Act. *See* Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 79 FR 58602-01. Payday lenders easily avoided the Military Lending Act because it was narrowly drawn. Consequently, Congress tasked the Department of Defense with analyzing whether the definition of "consumer credit" required revision.

The Department of Defense again surveyed enlisted servicemembers, finding 46% were saddled with at least one of the following types of loans—payday loans, vehicle title loans, bank deposit advance loans, pawn shop loans, cash advances on credit cards, overdraft loans, overdraft lines of credit, overdraft protection from other

accounts, relief society loans, and loans from friends and family. *See id*. Again, timeshare did not make the list.

To eliminate the payday loopholes, the Department of Defense amended the Military Lending Act's definition of "consumer credit" to "be defined consistently with credit that for decades has been subject to the [Truth in Lending Act], namely: [c]redit offered or extended to a covered borrower primarily for personal, family, or household purposes." *See* Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 80 FR 43560-01. The Department of Defense adopted the Truth in Lending Act's definition partially because its express purpose was to prohibit the same types of pernicious credit practices that the Military Lending Act deemed predatory. *See id*.

Since the Military Lending Act's enactment over 15 years ago, neither Congress nor the Department of Defense has ever referred to timeshare as being a predatory lending practice that should be regulated by the Military Lending Act. On at least two occasions, the Department of Defense reviewed survey evidence designed to ferret out the most pernicious lending practices to Servicemembers. *See* Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 79 FR 58602-01. Timeshares, which lack the characteristics of predatory lending, were never mentioned.

The legislative history confirms that Congress and the Department of Defense

never intended for the Military Lending Act to apply to timeshares and residential mortgages. Senator Talent was originally concerned with payday loans with APRs as high as 800% and the MLA itself caps annual interest at 36%, while the Louises' interest rate here is less than one-half the maximum the Military Lending Act allows. DE 16 at 28; DE 27-3 at 2; *see* 152 Cong. Rec. at S6406. There are no balloon payments or hidden compounding interest provisions. *See* DE 27-3. To the contrary, the Louises' timeshare transaction is precisely "the type of credit product[] that [is] amenable to [a] straightforward pricing mechanism[] relating to the cost of the funds borrowed (such as solely on the basis of a fixed or variable interest rate applied for a term or on a periodic basis)" which the Department of Defense considered non-predatory. *See* 79 FR 58602-01. Accordingly, the Court should find that Plaintiffs' timeshare mortgage is an exempt residential mortgage as Congress intended.[12]

## III. Exercising Article III Jurisdiction over this Case Would Disserve the Purposes of the Military Lending Act and Would Contravene Constitutional Limits on the Jurisdiction of the Federal Courts

Plaintiffs and amici principally make sweeping policy arguments unanchored from the pleadings and facts here. Amici, for example, argue that dismissal here

---

[12] Congress' and the various regulatory bodies' silence on this point is telling, and is further evidence that they never considered timeshare mortgages to be predatory, and that they never intended the Military Lending Act to apply to timeshare mortgages. *See Church of Scientology of California v. IRS*, 484 U.S. 9, 17-18 (1987) (applying the "dog that did not bark" canon of statutory interpretation); *Dep't. of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 342-43 (1999) (same).

somehow dilutes protections "from predatory lending" and threatens "operational military readiness," Consumer Financial Protection Bureau and Federal Trade Commission Br. at 23, without grappling with the differences between the loans targeted by the Military Lending Act and the loan here.

Again, the Military Lending Act's purposes are laudable, but this lawsuit does nothing to advance those purposes. Plaintiffs do not and cannot argue that Bluegreen charged interest in excess of the statute's cap on interest. Plaintiffs received lengthy disclosures; where Plaintiffs did not read the disclosures provided when provided or during the ensuing 10-day rescission period, it is unclear more disclosure would have been better disclosure; and, of course, requiring the letter "M" to be inserted before the acronym "APR" does nothing to improve military readiness.

More importantly, the Department of Defense has recognized that interpreting the Military Lending Act too broadly could "imped[e] the availability of credit that is benign or beneficial to Service members or their families." Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 72 FR 18157-01. Interpreting the Military Lending Act to apply to timeshares interests and to require additional disclosures would impose additional transactional costs without any identified, concrete benefit.

But most fundamentally, these policy arguments should be considered by Congress and not the Courts. "The law of Article III standing, which is built on

separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013), and "no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Trichell v. Midland Credit Mgmt.*, 964 F.3d 990 (11th Cir. 2020).

If Plaintiffs and amici were correct that additional lending protections are necessary for servicemembers and would not harm them by reducing available credit, those policy goals must be addressed through formal amendments to the Military Lending Act, through constitutional processes, to provide concrete, statutory protections and benefits to service members. Without such statutory changes and without factual allegations showing any concrete harms caused by unlawful conduct, Article III of the Constitution compelled dismissal.

## CONCLUSION

Bluegreen respectfully requests that this Court affirm the District Court's dismissal of the Amended Complaint.

Dated:  February 13, 2023        Respectfully submitted,

By: _Grace L. Mead_
Grace L. Mead (Florida Bar No. 49896)
Andrea N. Nathan (Florida Bar No. 16816)
Jenea M. Reed (Florida Bar No. 84599)
Joseph J. Onorati (Florida Bar No. 92938)
**STEARNS WEAVER MILLER**
Museum Tower
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: (305) 789-3559
Email: gmead@stearnsweaver.com
Email: anathan@stearnsweaver.com
Email: jonorati@stearnsweaver.com

*Attorneys for Defendants-Appellees*

*Louis v. Bluegreen Vacations Unlimited, Inc. et al.*
**Case No. 22-12217**

## CERTIFICATE OF COMPLIANCE

The undersigned attorney certifies that this document complies with the type-volume limitation contained in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 11,297 words, excluding the parts exempted by Fed. R. App. P. 32(f).

The undersigned attorney further certifies that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point font.

/s/ *Grace L. Mead*
Grace L. Mead
Florida Bar No. 49896

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on February 13, 2023, I uploaded and electronically filed this Response through the CM/ECF System, which will send a notice of electronic filing to all counsel of record, including counsel for Appellant. All participants in this case are registered CM/ECF users.

I also CERTIFY that I caused four copies of this document to be sent by FedEx to:

Clerk of Court
United States Court of Appeals, Eleventh Circuit
United States Courthouse
56 Forsyth Street, NW
Atlanta, Georgia 30303

/s/ *Grace L. Mead*
Grace L. Mead
Florida Bar No. 49896